750 So.2d 832 (1999)
STATE of Louisiana
v.
Allen SNYDER.
No. 98-KA-1078.
Supreme Court of Louisiana.
April 14, 1999.
*835 Marion B. Farmer, Covington, Counsel for Applicant.
Richard P. Ieyoub, Attorney General, Paul D. Connick, Jr., District Attorney, James Alan Williams, Alfred Adolphe Olinde, Jr., Counsel for Respondent.
KIMBALL, Justice.[*]
On August 29, 1996, a jury convicted defendant, Allen Snyder, of the first degree murder of Howard Wilson. One day later, after the penalty phase hearing, the *836 jury unanimously determined that defendant should receive the death penalty. Defendant was subsequently sentenced to death by the trial judge in accordance with the jury's determination. Pursuant to La. Const. Art. 5, § 5(D), defendant appeals his conviction and sentence, arguing five assignments of error.[1] Because we find error in the trial court's failure to investigate defendant's request for a continuance based upon a claim of incompetence caused by his alleged inability to assist his counsel due to a change in his medication that left him mentally unstable at the time of trial, we remand this case to the trial court for a hearing to determine whether a retrospective determination of defendant's competence is still possible. If such a determination is, in fact, possible, the trial court shall hold a hearing to determine whether defendant was competent at the time of trial. If the trial court finds that defendant was competent, no new trial is required as we find none of defendant's other assignments of error have merit and therefore conditionally affirm his conviction and sentence. If the trial court finds that a retrospective determination of defendant's competence cannot be had, or, if after hearing evidence, determines that defendant was not competent at the time of trial, defendant shall be entitled to a new trial.

FACTS
Defendant, Allen Snyder, and his wife, Mary Snyder, were having marital difficulties in the summer of 1995. Towards the end of their relationship, neither partner remained entirely faithful to the other. After several incidents of physical abuse at the hands of her husband, Mary Snyder took their children and went to live with her mother. Despite this separation, defendant contacted Mary one evening in mid-August and the two discussed the possibility of getting back together. Mary agreed to meet defendant the following day to discuss a reconciliation. Defendant was anxious to meet with Mary and wanted to see her that evening, but she put him off, telling him she "didn't want to see him" that night. Rec. vol. 6, p. 1267.
Instead, Mary went out on a late night date with Howard Wilson, a married man she claimed she had recently met. Defendant repeatedly tried to page her during the evening, but Mary refused to respond. At the end of their date, at approximately 1:30 a.m. on August 16, 1995, Howard Wilson pulled his vehicle up to the home of Mary's mother to drop Mary off. Defendant walked up to the car, opened the driver's side door of the vehicle, and attacked both Howard Wilson and Mary Snyder with some sort of knife containing a double-edged blade. He inflicted nine wounds upon Howard Wilson and nineteen wounds upon Mary Snyder.
Gwen Williams witnessed the assault. She testified that she observed defendant stooped down beside a trailer that was across the street from the home of Mary's mother. She then saw defendant run from the trailer to Wilson's car, open the car door, jump into the car and attack Howard Wilson and Mary Snyder. Williams screamed at defendant which caused him to run away. Williams then helped Mary to her mother's house and the police were called. Howard Wilson died at East Jefferson Hospital. Mary Snyder survived the attack and testified at trial.
Approximately twelve hours later, defendant called the police claiming he was suicidal. The police went to his house to investigate, initially unaware of the fact that he was a murder suspect, and found defendant barricaded in his house and curled into a fetal position on the floor. Police officers then took defendant to the Criminal Investigations Bureau and, after advising him of his rights, took a statement from defendant. In his statement, defendant claimed he went to Mary's mother's house "to see where she was and who she was with." Transcribed Audio *837 Tape Statement, p. 3. He stated he brought a knife to "scare her, make `em talk to me." Id. He told police that he approached the car not knowing whether Mary was inside the car or not. He opened the car door with the knife in hand and, according to his statement, told Howard Wilson they needed to talk. A scuffle then ensued. Defendant told police he was "out of control" at that time. Id. at 5. After the attack, defendant ran off, throwing the knife down somewhere along the way.
The state subsequently charged Allen Snyder with one count of first degree murder. After the trial, which began on August 27, 1996, a jury found defendant guilty as charged. After finding the presence of one aggravating circumstance,[2] the same jury unanimously determined defendant should receive the death penalty. A sentence of death was subsequently imposed by the trial court.

LAW AND DISCUSSION

Assignment of Error No. 1
In his first assignment of error, defendant argues that the evidence presented at trial did not support a conviction for first degree murder, but rather one for manslaughter. This claim is based upon the contention that defendant came upon the victim and Mary Snyder when they were engaged in a sexual act in the victim's car which was parked outside the home of Mary's mother.[3] Defendant maintains that when he saw his wife involved in sexual relations with another man, he was provoked to the point of losing his selfcontrol and cool reflection.[4]
Manslaughter is a homicide which would be either first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31(A)(1).[5] It is the presence of "sudden passion" and "heat of blood" that distinguishes manslaughter from murder. This court has repeatedly stated, however, that "sudden passion" and "heat of blood" are not elements of the offense of manslaughter. Rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed in the *838 absence of these factors. State v. Lombard, 486 So.2d 106 (La.1986); State v. Tompkins, 403 So.2d 644 (La.1981). Because they are mitigatory factors, a defendant who establishes by a preponderance of the evidence that he acted in "sudden passion" or "heat of blood" is entitled to a verdict of manslaughter. Lombard, 486 So.2d at 111.
Defendant argues that "some evidence" was introduced that established that defendant committed the crime in sudden passion or heat of blood. In reviewing this contention, we must determine whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. Lombard, 486 So.2d at 111. See also Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The defense argues the jury was aware of the marital difficulties between defendant and Mary Snyder, of Mary's extramarital affair and instances of domestic abuse as a result of those affairs. Furthermore, the jury heard evidence that defendant wanted a reconciliation with Mary and that she was open to such a possibility. Finally, the jury was aware that defendant had paged Mary continuously before the murder in an attempt to contact her. The defense maintains that defendant's discovery of his wife on a late date with the victim, after she had made reconciliation plans with defendant, sufficed to deprive him of his selfcontrol and cool reflection.
Although "some evidence" presented at trial supported a conclusion that the victim and defendant's wife were on a date, there was no evidence presented to support a determination that the two were involved in any type of sexual activity when defendant came upon them. Additionally, defendant's conflicting accounts of the incident make it difficult to determine his true motivation for the act. Defendant told police one version of the events and defense doctors yet another. The conflicting accounts given by defendant after the murder do not constitute affirmative, substantive evidence of his guilt, State v. Savoy, 418 So.2d 547 (La.1982), but they undoubtedly undercut the reasonableness of the principal defense theory of manslaughter.
The State theorized that defendant was a remorseless killer who repeatedly stabbed his wife and the victim then fled the scene, disposed of the murder weapon and created a flimsy suicide theory when he decided to turn himself in to the police. The prosecution presented evidence which established beyond a reasonable doubt that the defendant was guilty of first degree murder. Defendant's own confession and the testimony of two witnesses demonstrated that defendant waited and watched the victim and his wife and then approached them, while armed with a knife, on his own accord. According to defendant, he suggested that the three of them "talk." No talking ever occurred, however. Instead, as both Mary Snyder and Gwen Williams testified, defendant brutally stabbed his wife and Howard Wilson and then fled from the scene. Consequently, the verdict reflects the evidence admitted at trial. Jurors may rationally have concluded either that (1) defendant lied about the circumstances of the offense to excuse what the evidence otherwise overwhelmingly demonstrated, a specific intent homicide during a controversial course of action in which he also specifically intended to kill or to inflict great bodily harm on at least one other person (i.e., his estranged wife); or (2) that a reasonable person would not have been provoked to homicidal passion by the sight of his estranged wife with another man. In either case, the evidence supported the jury's verdict and rejection of the defendant's manslaughter defense.[6]

*839 Assignment of Error No. 2

Batson Claim
In his second assignment of error, defendant argues that the trial court erred in allowing the State to exercise five of its peremptory challenges against black prospective jurors in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Specifically, defendant contends that prospective jurors Jeffrey Brooks, Greg Scott, Thomas Hawkins, Jr., Elaine Scott, and Loretta Walker were impermissibly excluded by the State. The record of the voir dire proceedings reveals that the prosecutor used peremptory challenges to strike every African American called as a prospective juror who survived challenges for cause. This resulted in an all-white jury for the defendant, who is African-American.
Under Batson jurisprudence, a defendant must first establish a prima facie case of discrimination by showing facts and relevant circumstances that raise an inference that the prosecutor used his peremptory challenges to exclude potential jurors on the basis of race. If such a showing is made, the burden of production then shifts to the State to articulate a raceneutral explanation for the challenges. Finally, the trial court must determine whether the defendant carried his burden of proving purposeful discrimination. Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (Per Curiam); see State v. Collier, 553 So.2d 815 (La. 1989). The second step does not require an explanation that is persuasive, or even plausible, and unless a discriminatory intent is inherent in the State's explanation, the reason offered will be deemed race neutral. Purkett, 514 U.S. at 767, 115 S.Ct. at 1771. The ultimate burden of persuasion remains on the defendant to prove purposeful discrimination. See State v. Green, 94-0887, p. 28 (La.5/22/95), 655 So.2d 272, 290, and cases cited therein. A trial judge's determination pertaining to purposeful discrimination rests largely on credibility evaluations; therefore the trial judge's findings are entitled to great deference by the reviewing court. Batson, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21.
As an initial matter, the defense failed to lodge an objection to the State's use of its peremptory challenges against jurors Greg Scott and Thomas Hawkins, Jr., although counsel did note for the record that both jurors were African-American.[7] According to defense counsel, when Scott and Hawkins were struck by the State, counsel felt that no "pattern" of exclusion had emerged because the State had accepted an African-American juror, Jeffery Brooks (who was later backstricken *840 by the State).[8] Nevertheless, while defense counsel's choice not to object on Batson grounds until they felt a pattern of discrimination had emerged may have been a valid reason for delaying a request for a race-neutral explanation, it does not negate the fact that the State was never requested to provide a race-neutral explanation for its use of peremptory challenges on potential jurors Greg Scott and Thomas Hawkins, Jr. Even after lodging a Batson objection and requesting a race-neutral explanation for the State's challenge of other African-Americans, defense counsel never demanded such an explanation for these two jurors.
This court has traditionally applied La. C.Cr.P. art. 841 to errors occurring during voir dire.[9] It has consistently held that a defendant waives review of irregularities in the selection of the jury when an objection is not timely raised. See State v. Potter, 591 So.2d 1166, 1168 (La.1991) (failure to make Batson objection waived issue on appeal); State v. Spencer, 446 So.2d 1197, 1200 (La.1984) (review of improper exclusion of blacks from jury not preserved for appeal); State v. Whitt, 404 So.2d 254 (La.1981) (objection to failure to sequester jury at an earlier time waived); State v. Bazile, 386 So.2d 349 (La.1980) (improper procedure for selecting venire not reviewable where objection was made after jury was sworn); State v. Qualls, 377 So.2d 293, 298 (La.1979) (objection to State's use of peremptory challenges raised for first time on appeal came too late); State v. Landry, 262 La. 32, 262 So.2d 360 (1972) (issue waived where objection to three jurors improperly excluded for opposition to death penalty not timely made). With respect to prospective jurors Greg Scott and Thomas Hawkins, Jr., the defense failed to initiate the three-step Batson procedure properly and therefore the State did not offer race-neutral reasons for its challenges. Consequently, the trial court did not have the opportunity to rule on them. Defendant therefore waived any claim based upon the prosecutor's allegedly intentional discrimination against Greg Scott and Thomas Hawkins, Jr. and the issue is not properly before this court. Potter, 591 So.2d at 1168.
Defense counsel did, however, lodge the proper Batson objections to the State's use of peremptory challenges against potential jurors Jeffrey Brooks, Elaine Scott and Loretta Walker. The State originally accepted Brooks as a juror, but later backstruck him. The prosecutor's reasons for striking Brooks were that he appeared "very nervous" throughout questioning and that he would be missing class, as a student teacher, if chosen to serve on the jury. The prosecutor stated, "He's a student teacher. My main concern is for that reason, that being that he might, to go home quickly, come back with guilty of a lesser verdict so there wouldn't be a penalty phase." Rec. vol. 4, p. 954. Defense counsel responded by stating:
His main problem yesterday was the fact that he didn't know if he would miss some teaching time as a student teacher. The clerk called the school and whoever it was and the Dean said that wouldn't be a problem. He was told that this would go through the weekend, and he expressed that that was his only concern, that he didn't have any other problems.
As far as him looking nervous, hell, everybody out here looks nervous. I'm nervous.
Rec. vol. 4, p. 955. The court allowed the State to exercise a peremptory challenge on Brooks.[10]
*841 With respect to prospective juror Elaine Scott, the district attorney excused her, stating, "I observed she was very weak on her ability to consider the imposition of the death penalty. Her words, exactlyI wrote it down, that she thinks she could, and that's the reason for our challenge." Rec. vol. 4, p. 902. However, when asked again by the prosecution if she could impose the death penalty, she responded, "I could." Rec. vol. 4, p. 860. She also responded affirmatively when asked if she could listen to the evidence and consider whether to accept or reject the insanity defense and hold the defense to its burden of proof. Rec. vol. 4, p. 865-866. Nevertheless, the trial court accepted the State's explanation as race neutral and excused Elaine Scott.
The defense also lodged a Batson challenge when Loretta Walker was excused by the State. During voir dire Walker stated that she could not impose the death penalty based on her religious beliefs. Rec. vol. 4, p. 909. After further questioning, she did admit that under certain circumstances, for example if an innocent child was murdered, she could consider the death penalty. Rec. vol. 4, p. 921. Even though she was somewhat rehabilitated by the prosecutor, he excused her, stating, "The reason is very obvious that at first she said she could not do the death penalty for a long-standing, and then she said under a limited circumstance if he killed a child, she could do it. We don't have any evidence that this man killed a child, so." Rec. vol. 4, p. 958. The court allowed the State's challenge of Walker.
The trial court entertained the State's race neutral reasons for the exclusions without making a finding as to whether defendant had made a prima facie showing of purposeful racial discrimination. A trial court's "demand that a prosecutor justify his use of peremptory strikes is tantamount to a finding that the defense has produced enough evidence to support an inference of discriminatory purpose." State v. Green, 94-0887, p. 25 (La.5/22/95), 655 So.2d 272, 288. Nevertheless, the issue of whether the defense established a prima facie case of discrimination is moot once the prosecutor has offered a raceneutral explanation for the peremptory challenge and the trial court has ruled on the ultimate question of intentional discrimination. Id. (applying Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)). Nonetheless, any response will qualify as race neutral "unless a discriminatory intent is inherent in the prosecutor's explanation." Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).
Here, the trial court did not find that defendant had established purposeful discrimination and overruled the Batson objections. These rulings appear correct. Although not required by the caselaw, the State's proffered reasons were plausible, supported by the record and race-neutral. See, e.g., State v. Johnson, 621 So.2d 1167 (La.App. 2 Cir.1993) (veniremen appeared inattentive and unresponsive or failed to maintain eye contact); State v. McNeil, 613 So.2d 752 (La.App. 4 Cir.1993) (same); State v. Young, 613 So.2d 631 (La.App. 1 Cir.1992) (same); State v. Manuel, 517 So.2d 374 (La.App. 5 Cir.1987) (same); State v. Outley, 629 So.2d 1243 (La.App. 2 Cir.1993) (veniremen young, inattentive, or knew defense counsel); State v. Griffin, 618 So.2d 680 (La.App. 2 Cir.1993) (veniremen all smiles and giggles during voir dire on the death penalty). See also United States v. Cure, 996 F.2d 1136 (11th Cir. 1993) (venireman inattentive); cf. Hernandez, 500 U.S. at 357, 111 S.Ct. at 1868 (State response will qualify as race neutral "unless a discriminatory intent is inherent in the prosecutor's explanation"). The prosecutor's reasons constituted "legitimate" *842 grounds for the exercise of a peremptory strike. Purkett v. Elem, 115 S.Ct. at 1771 ("What [Batson] means by a `legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection."). None of the reasons articulated by the State are readily associated with the suspect class that is alleged to be the object of the State's discriminatory use of peremptory challenges. Defendant, the opponent of the strikes, offered no facts or circumstances supporting an inference that the State exercised its strikes in a racially discriminatory manner. Therefore, the defendant's proof, when weighed against the prosecutor's offered race-neutral reasons, was not sufficient to prove the existence of discriminatory intent. See State v. Green, 94-0887 at p. 27, 655 So.2d at 289.
After carefully reviewing the entire record of voir dire, we find no abuse of discretion or error by the trial court in its denial of defendant's Batson claims. The trial court heard the prospective jurors and concluded there were reasonable bases for the challenges in question. The record does not show that the State employed a tactic of purposeful discrimination in its exercise of peremptory challenges.
Defendant also argues that his attorneys were ineffective for failing to object to the prosecution's improper use of its peremptory challenges to exclude African Americans from the jury. Specifically, defendant points to counsel's failure to raise a Batson objection to the State's use of peremptory challenges on veniremen Greg Scott and Thomas Hawkins, Jr. Defendant maintains that his trial counsel erroneously believed that the presence of one African American juror, Jeffrey Brooks (who was later backstricken by the State) defeated any Batson claim. Defendant contends that this error prejudiced him because it allowed the prosecutor to exercise peremptory challenges to remove members of the defendant's race from the jury venire for a discriminatory purpose without having to provide a race-neutral reason.
Even assuming defense counsel erred in failing to make a Batson objection to the State's challenges of Greg Scott and Thomas Hawkins, Jr., this failure does not prejudice the defendant to the extent that the trial was rendered unfair and the verdict suspect. In Allen v. Hardy, 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986), the United States Supreme Court held that Batson would not be applied retroactively on collateral review. The Court noted that retroactive effect is "appropriate where a new constitutional principle is designed to enhance the accuracy of criminal trials." Allen, 478 U.S. at 259, 106 S.Ct. at 2880. The Court found, however, that although "the rule in Batson may have some bearing on the truthfinding function of a criminal trial[,] ... the decision serves other values as well ... only the first of which may have some impact on truthfinding." Id. Because protections afforded by Batson did not go "to the heart of the truthfinding function," Id., the Court held that Batson would not apply retroactively.
While the instant case does not deal with the question of retroactivity, the Court's comments on the import of Batson are pertinent to the considerations present in the prejudice prong of the Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), two-part test used in ineffective assistance of counsel claims. Where a rule does not have "such a fundamental impact on the integrity of factfinding," Allen, 478 U.S. at 259, 106 S.Ct. at 2881, it cannot be said that the violation of such rule renders the trial unfair and the verdict suspect.[11] *843 Thus, counsel's failure to make a Batson objection did not prejudice defendant. Accordingly, this argument lacks merit.

Photographs
Defendant next argues that the trial court erred in overruling defense objections to the admissibility of certain State exhibits. Specifically, defendant complains of the introduction into evidence of three autopsy photographs of the non-fatal wound to Howard Wilson's left cheek.[12] Outside the presence of the jury, defense counsel stated the grounds for objecting to the photographs as follows:
It's a wound from the ear to the mouth, and it was described as a hole in the decedent's face. The deputy testified that you could see into the hole and see the victim's tongue and his teeth. Those photographs show exactly that, and I don't think that the jury needs to see those photographs. Dr. Garcia, very fairly in her report, described this wound as nonfatal and in parenthesis, she let's [sic] us know how dramatic it is. She calls it "dramatic-appearing", and I think that that is a clue as to how prejudicial these photographs could be. It wasShe clearly described this wound as nonfatal, and she clearly warned us that it was very dramatic-looking.
There is no purpose. It doesn't establish cause of death. It doesn't show the jury anything other than how very gruesome this crime was. That has nothing to do with the very intellectual decision they have to make as to what kind of a murder it was. And this doesn't even show that it was a murder. This man would have fully recovered from this injury to his face, and I don't think that the jury needs to see what has already been testified to on the witness stand.
Rec. vol. 5, p. 1214.
Contrary, however, to defendant's assertions here and the arguments of defense counsel during trial, the State is entitled to the moral force of its evidence. State v. Robertson, 97-0177, p. 29 (La.3/4/98), 712 So.2d 8, 32. Postmortem photographs of murder victims are admissible to prove corpus delicti and to corroborate other evidence establishing cause of death and location and placement of wounds, as well as to provide positive identification of the victim. Robertson, 97-0177 at p. 29, 712 So.2d at 32; State v. Koon, 96-1208 (La.5/20/97), 704 So.2d 756; State v. Maxie, 93-2158 (La.4/10/95), 653 So.2d 526; State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190. Photographic evidence will be admitted unless it is so gruesome that it overwhelms the jurors' reason and leads them to convict defendant without sufficient other evidence, i.e., when the prejudicial effect of the photographs substantially outweighs their probative value. Robertson, 97-0177 at p. 29, 712 So.2d at 32; State v. Perry, 502 So.2d 543, 558 (La.1986), cert. denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987).
A review of the photographs complained of reveals that while the photographs of the wound to decedent's face are particularly graphic, they are relevant to illustrate the number and location of stab wounds to the victim. Additionally, the force necessary to inflict such a wound is also relevant to show defendant's specific intent to kill or to inflict great bodily harm. As such, the photographs' probative value outweighed any prejudicial effect. La. C.E. art. 403. The trial judge did not err in ruling that the photographs were admissible. Consequently, this portion of this assignment of error lacks merit.
*844 Defendant also complains of the admission of another series of photographs which depict him in a variety of martial arts poses. Some photographs depict defendant in a martial arts stance holding a knife-like weapon. Specifically, defendant contends that the photographs were erroneously admitted into evidence because they were remote in time, irrelevant and were introduced solely to prejudice defendant and show defendant was a "bad guy." The State, on the other hand, contends that the photographs were particularly relevant considering the suddenness and savagery of the attacks, the fact that the weapon used was some kind of double-edged knife and defendant's statement that he was "not familiar with, ha, with knives in a way." The State argues the photographs were admissible not only to refute defendant's statement that he was not familiar with knives, but also to show his obvious skill in using them.
Louisiana C.E. art. 401 provides that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." All relevant evidence is admissible, except as otherwise provided by law, and irrelevant evidence is not admissible. La. C.E. art. 402. However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, or waste of time. La. C.E. art. 403. Additionally, any photographic evidence which illustrates any fact, sheds light upon any issue in the case, or reliably describes a person, place or thing involved in the case, is admissible subject to a La. C.E. art. 403 balancing test. State v. Lindsey, 404 So.2d 466 (La.1981).
In the instant case, the determination of whether the photographs at issue are relevant to show the existence of any fact at trial is a close one. The prosecutor argued at trial that the photographs demonstrated defendant's martial arts training and disproved his assertion in his statement to the police that he had acted in self-defense during a struggle with the victim. The photographs, however, were taken more than ten years before trial, before defendant had even met his wife. The photographs were therefore remote in time. Moreover, the State's argument that the photos refute some vague assertion of self-defense made by defendant is also questionable because the fact that defendant had served in the military and had martial arts training did not automatically negate a claim of self-defense. On the other hand, the prosecution's argument that the pictures refuted defendant's statement that he was not familiar with knives has some merit.[13] The pictures showing defendant posed with the knife-like weapon clearly serve to rebut this statement. Additionally, as the State argues, the photographs can be viewed as evidence of defendant's specific intent to kill as they suggest he has experience and skill in the use of knives as weapons.
Although the photographs are arguably relevant even in light of the fact they were taken more than ten years before the crime occurred, their potential to prejudice the jury is certainly present. Considering the fact that defendant was charged with the brutal stabbing of his wife and her male companion, photographs depicting him in an "attack" position with what look like knives in his hands could give the jury a picture of him as a "bad man" and someone likely to commit such a crime. Thus, the probative value of the photographs was slight when compared to their tremendous potential to inflame the jury.
However, although the trial court arguably erred by admitting the photographs, the error was harmless at the guilt *845 phase. To determine whether an error is harmless, the proper analysis is "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." State v. Bourque, 622 So.2d 198, 241 n. 20 (quoting Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993)) (emphasis in original). In the instant case, the jury heard the testimony of the surviving victim and an eyewitness who described in detail defendant's brutal stabbing of the victim. Additionally, the jury also had access to defendant's inculpatory statements in which he confessed to the crime. In light of the overwhelming evidence against defendant, the erroneous admission of the photographs was unimportant in relation to the entire body of evidence presented at the guilt phase. Accordingly, the jury's rejection of defendant's proffered defenses was "surely unattributable to the error." Id. Thus, the trial court's admission of the photographs, even if in error, was harmless at the guilt phase and this portion of the assignment of error lacks merit.
Likewise, the admission of the photographs at the penalty phase was also harmless. An error committed in the penalty phase is harmless if the sentence actually rendered in this trial was surely unattributable to the error.[14]State v. Bourque, 622 So.2d at 241 n. 20. At the penalty phase, the complained of photographs paled in comparison to the violence of the crime already described in detail to the jurors and the overwhelming testimony of the various instances of domestic abuse Mary Snyder suffered at the hands of defendant. Testimony revealed that defendant had hit his wife with a baseball bat, threatened to hit her with a hammer, slammed her head into a bedroom wall, smashed her head against a windshield and stabbed her with a screwdriver. The photographs of defendant obviously posing for the camera with knife-like objects did not add any arbitrary factor into the jury's deliberations in light of this testimony. Thus, in this particular case, we conclude there is not a reasonable possibility that the introduction of the photographs at the penalty phase contributed to the sentence and their admission was harmless beyond a reasonable doubt. Consequently, this portion of this assignment of error is without merit.

Prosecutor's Argument
Defendant contends it was reversible error for the prosecutor to refer to the O.J. Simpson case during his closing argument in the penalty phase. Defendant points to the following exchange which occurred during the State's rebuttal argument:
State: Mr. Vasquez [defense counsel] tried to describe this man as being the man whoAnd it was 12 hours later when he called the Kenner Police Department, huddled up, claiming that he was suicidal, barricaded himself in the house. That made me think of something. Made me think of another case, the most famous murder case in the last, in probably recorded history, that all of you all are aware of
Defense: Your Honor, I object. I want to approach on this.
Court: Okay. Counsel, come forward.
(Whereupon, the following is taken at the bench, out of the hearing of the jury.)
Defense: He's going to mention the O.J. Simpson trial.
State: That case
Defense: I object to that.

*846 State: Your Honor, based upon what he did in this case, where he sat for about 12 hours, he huddled and pretended to kill himself, just like O.J. did and just like O.J. got away it [sic]. I think that's fair
Defense: That's ridiculous.
State: It's a fair comment and those people will decide what weight they want to give to it.
Defense: Judge, that's
State: That is as ridiculous as some of the things you said, and I think that's fair comment on something that's common knowledge. And certainly, those people are intelligent enough to give it whatever weight they want to.
Court: I'm going to allow it.
Defense: Note our objection. Please note our objection.
(Whereupon, the following is taken in the hearing of the jury.)
State: The most famous murder case, and all of you all have heard about it, happened in California very, very, very similar to this case. The perpetrator in that case claimed that he was going to kill himself as he drove in a Ford Bronco and kept the police off of him, and you know what, he got away with it. Ladies and Gentlemen, is it outside the realm of possibility that that's not what that man was thinking about when he called in and claimed that he was going to kill himself?
Rec. vol. 7, p. 1591. Specifically, defendant alleges the comments by the prosecutor were so prejudicial that they influenced the jury and contributed to their decision to impose the death penalty. Defendant claims that "it has been proved by countless polls that the majority of white Americans believe that O.J. Simpson was guilty of murdering his wife and, by virtue of the not guilty verdict returned in him criminal case, that he `got away with murder.'" Br. at 27. Consequently, the defense argues, because the defendant is African-American and the jury was all white, the effects of the prosecutor's comments were devastating.
Louisiana C.Cr.P. art. 774 provides that the scope of argument "shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case." Article 774 further provides that the argument "shall not appeal to prejudice." Nevertheless, a prosecutor retains "considerable latitude" when making closing arguments. State v. Taylor, 93-2201 p. 19 (La.2/28/96), 669 So.2d 364, 374. A conviction or sentence will not be reversed for improper closing argument unless this court is thoroughly convinced the remarks influenced the jury and contributed to the verdict. Taylor, 93-2201 at p. 21, 669 So.2d at 375; State v. Kyles, 513 So.2d 265, 275 (La.1987); State v. Knighton, 436 So.2d 1141, 1152 (La.1983). Even where the prosecutor's statements are improper, credit should be accorded to the good sense and fairmindedness of the jurors who have heard the evidence. Kyles, 513 So.2d at 276; State v. Jarman, 445 So.2d 1184, 1187 (La.1984).
In the instant case, even assuming the prosecutor's statements regarding the O.J. Simpson case were improper, it cannot be said they created a substantial risk that the death penalty would be imposed under the influence of passion, prejudice or arbitrary factors. Thus, in light of the deference given to the good sense and fairmindedness of jurors and after reviewing the comments as a whole, we are not firmly convinced that they influenced the jury or contributed to the verdict. This portion of the assignment of error is without merit.

Assignments of Error Nos. 3 and 4
In these assignments of error, defendant argues that the trial court erred in failing to continue the trial to allow defense counsel adequate time to prepare and to develop a defense of insanity. Specifically, defendant argues that the trial court's denial of a continuance to allow his anti-depressant medication enough time to remedy his *847 unfocused, tangential and circumstantial ideation rendered him unable to effectively communicate with his attorney and therefore unable to assist his counsel. According to the defense, defendant's mental instability at the time of trial, which included difficulties in focusing on questions and in answering them in a coherent manner, caused him to be incapable of testifying in his own defense. Br. at 15.
Prior to the trial, defendant filed a motion to appoint a sanity commission in which it was alleged that defendant had been diagnosed with a depressive disorder since his incarceration and was under the care of the Jefferson Parish Prison psychiatrist, Dr. Richard Richoux. Furthermore, the motion stated that defendant's counsel had noted what she believed "may be a deterioration in defendant's mental capabilities, particularly in relation to his ability to assist in his defense." Specifically, defendant's attorney noted that defendant "appears to counsel to be severely depressed, and has been increasingly unfocused, scattered, and poorly communitative [sic] in interviews. Defendant is unable to answer even simple questions regarding the facts of his case." Rec. vol. 1, p. 144. This motion was granted on July 29, 1996.
On August 1, 1996, defendant was examined for his competency to stand trial by Dr. Debra DePrato, a forensic psychiatrist, and Dr. Barbara McDermott, a clinical psychologist. A sanity hearing was held on August 8, 1996, in which Dr. DePrato testified that in her opinion, defendant "is able to assist in his own defense as well as understand the proceedings against him." Rec. vol. 2, p. 372. However, Dr. DePrato testified that defendant had some difficulty focusing on certain issues and became mildly circumstantial and tangential. Because of these difficulties, Dr. DePrato reiterated the recommendation contained in her report that defendant's medication prescribed for the treatment of depression be changed from Sinequan to Prozac or Zoloft. She testified this change in medication was necessitated by the fact that defendant could only tolerate very low dosages of Sinequan, which did not totally alleviate defendant's symptoms, before bothersome side effects occurred. Regarding this change in medication, Dr. De-Prato testified as follows on cross-examination by defendant's attorney:
Q. [I]s it your opinion that he needs to have his medication changed because the side effects are making it impossible to up his dosage?
A. Well, there's really two reasons, if I can explain.
Q. Sure.
A. Dr. Richoux has felt that Mr. Snyder was depressed since his incarceration. He's been on Sinequan, off and on, and hasn't been able to take it at times because of the side effects of that medication. So that he hasn't been on it consistently enough, I think for it to help, as well as, if his dosage was increased, it may have helped more. But because of urinary retention, constipation, those kind of side effects, the dosage hasn't been able to be increased. So it's really a combination of things. So that I don't really know that it's been very effective at all, because he hasn't been on it as consistently as he should have been also.
Q. If he were placed on medication which did not cause these side effects so that he could be placed on a proper dosage, how long do you think it would be before the symptoms were alleviated to the point where he could possibly where the symptomswhere he could possibly focus more?
A. Typically, a medication like I'm recommending, Prozac or Zoloft doesn't interfere with urinary retention problems. So he shouldn't have any problems with that. You can see benefits from one to two weeks in attention and concentration, but full benefits are about six weeks later. So some people begin to respond immediately while the full maximum potential can take about six weeks.
Q. Okay. And you have made that recommendation, and you have asked that a *848 copy of your report be sent to Dr. Richoux?
A. Yes. I feel the jail would benefit from a copy so we wouldthey would know our recommendations regarding that since they were concerned about his issue of competency as well.
If I could add one thing about the symptoms, I forgot
Q. Sure.
A. to mention. One of the symptoms Mr. Snyder complained about that is probably a side effect of this medication was kind of light-headedness or feeling cloudy headed which is a common side effect of Sinequan. So if stopped that, that would stop immediately.
Q. Okay.
A. Or get better.
Q. Could I ask you just briefly about your conclusionsyou indicate the [sic] he occasionally has difficulty focusing on questions asked of him, and becomes mildly circumstantial and tangential. That's what you were describing a few questions ago?
A. Tangential means getting off the subject, and circumstantial means giving a lot of over-detailed information without really giving the information you need.
Q. Okay. And Doctor, is it your opinion that a change in medication could alleviate both symptoms that make it difficult to communicate with him?
A. Yes. It could improve those.
Rec. vol. 2, p. 374. Following the testimony of Dr. DePrato, both parties stipulated that if Dr. McDermott, the psychologist who examined defendant along with Dr. DePrato, were called to testify, her testimony would essentially be the same as that of Dr. DePrato. Rec. vol. 2, p. 376.
At the conclusion of the sanity hearing, the trial court found defendant competent to stand trial, stating only, "The Court finds that Mr. Snyder is able to understand the proceedings against him, and is able to assist in his defense. And therefore, is competent to stand trial." Rec. vol. 2, p. 377.
On August 16, 1996, defendant's medication was changed from Sinequan to Prozac by defendant's attending psychiatrist at the Jefferson Parish Correctional Center. Defense counsel then moved for a five-week continuance so that defendant could receive the full benefit of the new medication which would allow his mental state to improve to the point where he could fully assist his counsel. A hearing on this motion was held on August 20, 1996. At this hearing, defense counsel introduced and filed into the record a letter from Dr. Richoux, defendant's attending psychiatrist, to the trial judge which states that effective August 16, 1996, defendant's antidepressant medication had been changed to Prozac and that it would take approximately six weeks for defendant to attain the maximum therapeutic benefits of the new drug. Dr. Richoux informed the court that the change in medication was necessary because "Mr. Snyder continues to display severe depressive symptoms that may interfere with his ability to assist his attorney...." Although defendant's counsel stated at this hearing that defendant was "technically" competent, her argument was directed at defendant's alleged inability to assist in his own defense. Rec. vol. 2, p. 411. Defense counsel told the court she was requesting a five-week continuance so that defendant could receive the full benefit of the new medication which would allow him to have "every bit of my assistance, which I cannot render adequately at this time." Rec. vol. 2, p. 408.
Although the trial court noted that Dr. Richoux's report stated that defendant's symptoms may interfere with his ability to assist his attorney, rec. vol. 2, p. 410, defendant's request for a continuance was denied. In denying the request, the court stated only, "Well, based on Dr. Deprado's [sic] testimony and in her report that he isthat the symptoms do not interfere with his ability to understand the proceedings *849 against him or to assist in his defense, I'm going to go ahead and deny the motion." Rec. vol. 2, p. 412.
On August 22, 1996, defendant was given a psychological evaluation by Dr. Elaine Salzer, a clinical psychologist. Although she was not called to testify at trial because she was out of town at the time, her report was proffered by the defense. Dr. Salzer's report notes that defendant had been on Prozac for about one week prior to her examination and, at the time of the examination, had not had sufficient time to stabilize on this medication. Dr. Salzer's report also observes that once defendant's condition stabilizes on the medication, it is reasonable to assume that his cognitive processes should become sharper and more focused.
On August 27, 1996, a motion for in camera testimony by the defense attorney regarding defendant's ability to assist counsel was filed and heard. In this motion, defense counsel asked that she be allowed to present in camera testimony detailing the difficulties she experienced in communicating with defendant which rendered him unable to assist in his defense and therefore rendered her assistance ineffective. Defendant's attorney sought to give this testimony in camera, out of the presence of the Assistant District Attorney, because of the confidential nature of the attorney-client communications at issue. The trial court summarily denied the motion for in camera testimony, but allowed defense counsel to testify in open court as to her concerns regarding matters of a non-confidential nature. Defendant's attorney testified that her representation of Mr. Snyder had been compromised by his state of mind, due to the fact that he had been severely depressed and inadequately treated. Rec. vol. 2, p. 474.
As a general matter, the decision to grant or deny a motion for continuance rests within the sound discretion of the trial judge, and a reviewing court will not disturb a trial court's determination absent a clear abuse of discretion. La. C.Cr.P. art. 712; State v. Strickland, 94-0025, p. 23 (La.11/1/96), 683 So.2d 218, 229; State v. Bourque, 622 So.2d 198, 224 (La. 1993), overruled on other grounds by State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16. Whether a refusal to grant a continuance was justified depends on the circumstances of the particular case presented. State v. Bourque, 622 So.2d at 224; State v. Simpson, 403 So.2d 1214, 1216 (La. 1981). Generally, this court declines to reverse convictions for improper denial of a motion to continue absent a showing of specific prejudice. State v. Strickland, 94-0025 at p. 23, 683 So.2d at 229; State v. Gaskin, 412 So.2d 1007, 1011 (La.1982).
Limits on the court's discretion to grant or deny a continuance, however, are imposed by defendant's constitutional rights, including his rights to understand the proceedings against him, to assist in his defense, and to the assistance of counsel. See United States v. Soldevila-Lopez, 17 F.3d 480, 487 (1st Cir.1994). If a defendant lacks the ability to communicate effectively with counsel, he may be unable to exercise other rights deemed essential to a fair trial. Cooper v. Oklahoma, 517 U.S. 348, 364, 116 S.Ct. 1373, 1381, 134 L.Ed.2d 498 (1996). Constitutional due process requires that the trial of an accused be conducted only when he is legally competent. Bishop v. United States, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956); State v. Nomey, 613 So.2d 157 (La.1993). The test for determining defendant's mental competency depends upon "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understandingand whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 403, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960). Defendant's allegations that he was unable to communicate with his attorney thus raise serious constitutional issues. Because the record reflects that the trial court failed to make further inquiry into defendant's claims that he needed to be stabilized on his new medication in order to effectively *850 communicate with his counsel and assist in his defense when such claims, combined with objective medical evidence, raised a sufficient doubt as to defendant's competence, we must question whether defendant received a fair trial in this regard.
In Drope v. Missouri, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), the Court reversed petitioner's conviction because the record before it revealed that the lower courts failed to give proper weight to information suggesting petitioner's incompetence that came to light during trial. The Court found that the failure to make further inquiry into petitioner's competence to stand trial denied him a fair trial. In reaching its conclusion, the Court stated:
The sentencing judge and the Missouri Court of Appeals concluded that the psychiatric evaluation of petitioner attached to his pretrial motion for a continuance did not contain sufficient indicia of incompetence to stand trial to require further inquiry. Both courts mentioned aspects of the report suggesting competence, such as the impressions that petitioner did not have `any delusions, illusions, hallucinations...,' was `well oriented in all spheres,' and `was able, without trouble, to answer questions testing judgment,' but neither court mentioned the contrary data. The report also showed that petitioner, although cooperative in the examination, `had difficulty in participating well,' `had a difficult time relating,' and that he `was markedly circumstantial and irrelevant in his speech.' In addition, neither court felt that petitioner's episodic irrational acts described in the report or the psychiatrist's diagnoses of `(b)orderline mental deficiency' and `(c)hronic (a)nxiety reaction with depression' created a sufficient doubt of competence to require further inquiry.
Id. at 175, 95 S.Ct. at 905.
The Court noted that it did not appear the examining psychiatrist was asked to specifically consider the issue of petitioner's competence to stand trial and, like the report itself, the petitioner's "somewhat inartfully drawn motion for a continuance" did not clearly suggest that petitioner's competence to stand trial was the question sought to be resolved. However, it found the sentencing judge erred in concluding that counsel's pretrial contention that "the defendant is not a person of sound mind and should have a further psychiatric examination before the case should be forced to trial" did not raise the issue of petitioner's competence to stand trial. Finally, the Court concluded that at the stage at which the pretrial motion for continuance was filed, "it would have been, at the very least, the better practice to order an immediate examination under [Missouri law]." Id. at 177, 95 S.Ct. at 906.
Similarly, in Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), the Court held that the failure to observe procedures adequate to protect a defendant's right not to be tried while incompetent deprives him of his due process right to a fair trial. There, the Court expressed doubt as to whether a defendant can waive the defense of his competence to stand trial, stating, "But it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently `waive' his right to have the court determine his capacity to stand trial." Id. at 384, 86 S.Ct. at 841. The Court also noted that even when a defendant does not explicitly state that competence to stand trial is at issue, trial judges must consider the question of competency where the evidence presented raises a doubt as to defendant's competence. Id. at 384 n. 6, 86 S.Ct. at 841 n. 6.
Thus, if there is a sufficient doubt as to the mental competency of an accused, the trial court has a responsibility to order a hearing sua sponte. Griffin v. Lockhart, 935 F.2d 926 (8th Cir.1991). The Pate procedural guarantee is violated when, in light of what was then known to the trial court, the failure to make further inquiry into defendant's competence to stand trial denied him a fair trial. Lokos *851 v. Capps, 625 F.2d 1258, 1261 (5th Cir.1980) (citing Drope, 420 U.S. at 174, 95 S.Ct. at 905). The relevant question is: "Did the trial judge receive information which, objectively considered, should reasonably have raised a doubt about defendant's competency and alerted him to the possibility that the defendant could neither understand the proceedings or appreciate their significance, nor rationally aid his attorney in his defense." Lokos, 625 F.2d at 1261.
Although defendant's counsel stated in the hearing on the motion to continue that defendant was "technically" competent, her arguments raised the issue of whether defendant could communicate with her well enough to allow her to effectively assist him. A comprehensive reading of her arguments regarding defendant's inability to communicate leads us to believe that defense counsel's statements which seemingly concede defendant's competence actually referred to that prong of competence relating to defendant's capacity to understand the proceedings against him. Obviously, her complaints of difficulty in communicating with defendant which hindered her ability to assist him and her references to Dr. Richoux's letter which stated that defendant's depressive symptoms may interfere with his ability to assist his attorney relate to defendant's ability to assist in his defense. These complaints, coupled with the medical evidence presented, while not necessarily dispositive of the competency issue, were nevertheless sufficient to warrant the trial court's attention. Its failure to further inquire into defense allegations that defendant was experiencing difficulties in communicating with his attorney was therefore error.
At the time defendant's motion to continue the trial was heard, the trial court had before it the report and testimony of a psychiatrist and a clinical psychologist which opined that defendant was competent to stand trial, but had difficulty focusing on questions asked of him and became mildly circumstantial and tangential and consequently would benefit from a change in medication to control his depressive disorder. Additionally, testimony revealed that once this change in medication occurred, it would take six weeks for defendant to receive the maximum benefits of the new drug. Moreover, the trial court had before it a letter from defendant's attending psychiatrist stating that defendant's medication had been changed because of defendant's display of severe depressive symptoms "that may interfere with his ability to assist his attorney" and that it would take approximately six weeks for defendant to attain the maximum therapeutic benefits of the new medication. The trial court was also aware of defense counsel's allegations that defendant's thinking was attenuated and he needed to be stabilized on the new medication before he could adequately assist in his defense. This evidence, centering on defendant's difficulties in communicating and alleged inability to assist counsel, should have raised a question of defendant's competence in the judge's mind. As was noted in Cooper v. Oklahoma, 517 U.S. 348, 354 n. 4, 116 S.Ct. 1373, 1377 n. 4, 134 L.Ed.2d 498 (1996), "Indeed, the right not to stand trial while incompetent is sufficiently important to merit protection even if the defendant has failed to make a timely request for a competency determination." See also La.C.Cr.P. art. 642.[15] This is nevertheless true even in the face of defense counsel's statements that she was not asking for the continuance on the ground of defendant's incompetence, for, as noted above, her arguments were actually directed to his competence and it is doubtful that defendant can waive his due *852 process right not to stand trial while incompetent.
With all of the evidence before it that at least raised some question as to defendant's competency, particularly as to his ability to assist counsel before he was fully stabilized on new medication, the trial court failed to make any investigation into the validity of these concerns. The trial judge did not, for example, interview defendant on the record nor did he ask defense counsel to elaborate on the problems defendant was experiencing. In fact, when defense counsel asked to give the court specific examples of the difficulties she was encountering, she was summarily denied the opportunity to do so. It is not that we believe defendant was in fact unable to assist his attorney or that he was otherwise incompetent. Rather, it is the trial court's absolute failure to investigate these claims, which were substantiated by objective medical evidence, that causes us to determine he abused his discretion in failing to investigate defense claims of incompetence.
Although Drs. DePrato and McDermott concluded that defendant was able to understand the proceedings against him and was able to assist in his own defense at the time of their evaluation of him, the trial court could not base its decision regarding defendant's competency solely on the conclusions of these doctors, especially in light of the medical evidence presented after the evaluation was completed. As we noted in State v. Bennett, 345 So.2d 1129, 1137 (La.1977) (on rehearing), "[T]he trial court may not rely so extensively upon medical testimony as to commit the ultimate decision of competency to the physician." The facts to consider in determining a defendant's ability to assist in his defense include: whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial. Bennett, 345 So.2d at 1138. The record contains no evidence that the trial court considered any of these factors when the question of defendant's ability to assist in his own defense was raised.
Had the record in this case contained some affirmative evidence that the trial judge conducted any investigation into defense allegations that defendant could not assist his counsel, our result may have been different. For example, in United States v. Lopez, 71 F.3d 954 (1st Cir.1995), abrogated on other grounds by United States v. Wells, 519 U.S. 482, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997), defendant learned he had a small brain lesion or tumor about two weeks into his trial. After a recess, a hearing was held to consider defendant's motions for a mistrial based on lack of competency or for a continuance for purposes of treatment. The court observed that defendant was not claiming that he was incompetent; instead, he argued that the trial court's failure to halt the proceedings so that defendant could have surgery violated his constitutional rights by imposing a regime of medication that so impaired his abilities that he was unable to testify coherently on his own behalf. The basis of defendant's arguments was that medications prescribed for his condition caused side effects, such as grogginess, that interfered with his ability to proceed and his attorneys stated that defendant had problems communicating with them and was not able to cooperate fully. Following several examinations by doctors and its own observations, the trial court denied the motion and the trial continued, with defendant testifying in his own defense. The court of appeals, citing the careful investigation of the trial court into *853 the matter, found no abuse of discretion, stating:
Lopez' health obviously warranted an inquiry by the trial judge. Far from ignoring the issue, the trial court deferred trial for a substantial period, summoned medical experts one after another, took an active role in securing diagnoses for Lopez, had him re-examined repeatedly, and took testimony and made findings in abundance, including a detailed post-trial order summarizing the court's findings and reasons for proceeding with trial.
* * *
Lopez' main trial counsel did protest at times that his client was not able to cooperate fully; but these complaints of Lopez' conduct during trial are balanced, if not outweighed, by the district court's findings that Lopez appeared to be well oriented and was cooperating with counsel.
Id. at 958.
Other courts have also affirmed a trial court's denial of a continuance in circumstances similar to the ones presented in Lopez, but in those cases the record clearly supported the trial court's decision. The defendant in United States v. Moore, 27 F.3d 969 (4th Cir.1994) requested a continuance, contending he was physically and psychologically unable to stand trial and psychologically unable to assist in his defense. After a hearing on the motion in which a letter from defendant's psychiatrist was produced which stated that defendant was suffering anxiety and depression that impaired his ability to assist in his defense, the court denied the motion. The appellate court declined to reverse the court's ruling, finding that sufficient evidence was presented to support the trial court's ruling. For example, defendant's counsel conceded that defendant had actively participated in readying his defense by contacting and interviewing witnesses, preparing documents and working closely with his attorneys. Additionally, the trial court observed on the record that defendant "did not appear to be in any acute distress and consulted with his counsel throughout the proceedings." Moore, 27 F.3d at 973. In United States v. Nasim, 932 F.2d 964 (4th Cir.1991) (unpublished per curiam), defendant moved for a continuance based on the unavailability of medications prescribed by his doctor. The trial court denied the motion. The court of appeals found no abuse of discretion in the denial because defense counsel advised the court that his client was able to communicate with him about the issues in the case and the trial court itself noted that defendant sounded "perfectly rational." Finally, in Fisher v. State, 736 P.2d 1003 (Okla. Crim.App.1987), defendant requested a continuance during his trial, contending he had taken two tablets of Mellaril to control his anxiety which he had "saved" from the jail and the medication made him feel intoxicated, drowsy and unable to think clearly. The trial court conducted an in camera hearing at which defendant's doctor testified that even if defendant had taken two tablets at the time he said he did, the effects of the medication would have worn off in six hours and two witnesses testified that defendant acted no differently on this day than on any other and did not appear to be under the influence of any drugs. The trial court denied the motion, stating that even if he had taken the medication, defendant's ability to think or to communicate had not been impaired. Defendant then took the stand and testified coherently in his own defense. The reviewing court held that, on the record before it, it could not find an abuse of discretion in the trial court's denial.
Unlike the records present in the cases discussed above, the record before us gives us no basis upon which to determine that the trial court did not err in failing to make further inquiry into defendant's competency. In contrast to the Lopez court, the trial court in this case did not undertake any investigation into the allegations made by defense counsel that defendant was having difficulties communicating with her. Such an investigation was warranted in light of the fact that Drs. DePrato, McDermott, Richoux and Salzer all believed that defendant's condition necessitated *854 the change in medication and that it would take approximately six weeks for the drug to reach its maximum effectiveness. There is no affirmative indication on the record by the judge, the district attorney or the defense attorneys that the defendant could, in fact, or did, in fact, assist his attorney. Furthermore, defendant did not testify in either phase of his trial, so we cannot review his testimony and determine whether he had any significant difficulties in communicating. Finally, when defendant's counsel offered to specify for the record the difficulties she was experiencing in attempting to represent defendant, she was prevented from doing so by the trial judge. For all of these reasons, we cannot say with certainty whether defendant received a fair trial. Consequently, the record before us does not permit us to find that the trial court did not err in failing to make further inquiry into defendant's competency.
Having found that the trial court abused its discretion in failing to investigate defendant's claims of incompetency, we must now determine the proper remedy. In the instant situation, we believe a nunc pro tunc hearing to determine whether defendant was competent at the time of his trial is appropriate if a meaningful inquiry into defendant's competency can still be had.
In State v. Nomey, 613 So.2d 157 (La. 1993), defendant was allowed to plead guilty to first degree murder one day after the members of a sanity commission conducted their examinations. In a motion for post-conviction relief, defendant argued the trial court's failure to conduct a hearing on the issue of his sanity prior to accepting his guilty plea violated his due process rights. The trial court denied the request for post-conviction relief, but on appeal the court of appeal ordered the trial court to conduct an evidentiary hearing to determine defendant's capacity to proceed at the time of the entry of the plea. After the hearing, the trial court held defendant had the capacity to proceed when the plea was entered. The court of appeal affirmed this determination. This court held the court of appeal erred in remanding the case for a retroactive sanity hearing because the trial court's acceptance of the plea without first resolving the issue of defendant's competency violated defendant's due process rights. The court did, however, note the following:
The present case is distinguishable from a case such as State v. Bennett, 345 So.2d 1129 (La.1977). In Bennett, the sanity hearing was held, but the examining physicians admitted that they could not be certain of their results without further clinical evaluation of defendant. The trial judge failed to order additional testing upon defendant's request. Defendant was thereafter found guilty as charged by a jury. On appeal, we remanded for another sanity hearing following a complete reexamination of the defendant. Unlike the present case, the defendant in Bennett did receive a hearing, at which the members of the sanity commission testified. Further, the defendant in Bennett alleged he suffered from mental retardation, which we found to be a more static condition than mental illness. Hence, under certain limited circumstances, a retroactive determination of sanity may be permissible. Likewise, we do not mean to foreclose the possibility of a nunc pro tunc competency hearing, if a meaningful inquiry into defendant's competence can still be had, in those cases where the trial judge ignores a bona fide doubt as to defendant's competence to stand trial, or the issue of competence is not raised at trial. See Lokos v. Capps, 625 F.2d 1258 (5th Cir.1980); Zapata v. Estelle, 588 F.2d 1017 (5th Cir.1979). Those cases are not applicable to the present case, however, since defendant did raise the issue of competence prior to trial and the trial judge agreed there was reasonable ground for a mental examination under La.Code Crim.P. art. 643.
Nomey, 613 So.2d at 162 n. 8. Thus, Nomey does not preclude the possibility of a nunc pro tunc competency hearing in a case such as the one sub judice where the *855 trial judge ignored a bona fide doubt as to defendant's competence to stand trial.
The federal courts of appeals, although noting that retrospective competency hearings are not favored, have allowed nunc pro tunc hearings on the issue of competency if a meaningful inquiry into the defendant's competency can still be had. See, e.g., Reynolds v. Norris, 86 F.3d 796 (8th Cir.1996); Watts v. Singletary, 87 F.3d 1282 (11th Cir.1996); United States v. Renfroe, 825 F.2d 763 (3rd Cir.1987); Zapata v. Estelle, 588 F.2d 1017 (5th Cir.1979). The trial court is in the best position to determine whether it can make a retrospective determination of defendant's competency during his trial and sentencing. Renfroe, 825 F.2d at 767. The determination of whether a trial court can hold a meaningful retrospective competency hearing is necessarily decided on a case-by-case basis. Miller v. Dugger, 838 F.2d 1530 (11th Cir.1988). The State bears the burden to show the court that the tools of rational decision are available. Lokos v. Capps, 625 F.2d 1258 (5th Cir.1980).[16]
A "meaningful" determination is possible "where the state of the record, together with such additional evidence as may be relevant and available, permits an accurate assessment of the defendant's condition at the time of the original state proceedings." Reynolds, 86 F.3d at 802. Additionally, "[w]hen determining whether a meaningful hearing may be held, we look to the existence of contemporaneous medical evidence, the recollections of non-experts who had the opportunity to interact with the defendant during the relevant period, statements by the defendant in the trial transcript, and the existence of medical records. The passage of time is not an insurmountable obstacle if sufficient contemporaneous information is available." Reynolds, 86 F.3d at 803 (citations omitted). The court in Miller v. Dugger, 838 F.2d 1530 (11th Cir.1988) noted that it had never given the district courts a list of factors that must be met in order to determine that a nunc pro tunc determination of competency is possible, but stated that relevant factors include time, availability of witnesses and the existence of evidence on the state record about the defendant's mental state at the time.
Because we believe a nunc pro tunc competency hearing may be possible to rectify the trial court's error in failing to make further inquiry into defendant's competency prior to trial, we will remand the case to the trial court for the sole purpose of determining whether such a hearing is now possible and, if so, to conduct such an evidentiary hearing. Because of the sparse testimony before the trial court, we envision the taking of additional testimony and evidence, including medical testimony relating to defendant's mental condition during that time prior to trial when he was allegedly unstabilized on his new medication and the records of examining physicians made during that time period, to allow the trial court to determine whether defendant was competent.[17]See Renfroe, *856 825 F.2d at 767. If the trial court concludes defendant was competent, no new trial is required to be conducted. United States v. Haywood, 155 F.3d 674 (3rd Cir. 1998). If the trial court finds a meaningful inquiry cannot be had, or if it determines after the hearing that defendant was not competent at the time of his trial, defendant shall be entitled to a new trial.[18]See United States v. Mason, 52 F.3d 1286 (4th Cir.1995); Zapata v. Estelle, 588 F.2d 1017 (5th Cir.1979).
In a related assignment of error, defendant argues that the trial court erred in failing to grant a continuance to give defense counsel more time to prepare. According to the defense, counsel for defendant's penalty phase received his appointment to represent defendant on May 3, 1996, with a trial date on a charge of first degree murder set for August 27, 1996.[19] Prior to trial, defendant filed a second motion for continuance alleging that the penalty phase attorney would only have three and one-half months from the date of his appointment (and two months from the date the State announced it would seek the death penalty) in which to prepare defendant's penalty phase defense. The defense alleged that although it had undertaken "an aggressive effort to investigate the case for mitigation and to prepare its presentation" it needed an additional thirty days to adequately prepare. In a separate motion for continuance, the penalty phase attorney again requested a continuance based on the fact that he had participated in another first degree murder trial beginning on July 22, 1996, and lasting ten days. As a result of the time spent preparing for and conducting that trial, defendant's counsel alleged he had less than four weeks to investigate and prepare defendant's mitigation case which included conducting interviews in defendant's hometown of Waterproof, Louisiana, three hours away from counsel's office. After the hearings on these motions, the trial court denied both without reasons.
The denial of a motion for continuance on grounds of counsel's lack of preparedness does not warrant reversal unless counsel demonstrates specific prejudice resulting from the denial. State v. Haarala, 398 So.2d 1093, 1099 (La.1981). This specific prejudice requirement has been disregarded by this court in cases where the preparation time was so minimal as to call into question the basic fairness of the proceeding. State v. Jones, 395 So.2d 751 (La.1981); State v. Durio, 371 So.2d 1158 (La.1979). This court has also held that when preparation time is unreasonably short, counsel has been diligent, and there is a general allegation of prejudice, denial of a motion for a continuance is an abuse of discretion which constitutes reversible error. Durio, 371 So.2d at 1161; State v. Winston, 327 So.2d 380 (La.1976) (conviction for distribution of heroin reversed when defense counsel was given only three days in which to prepare for trial); State v. Simpson, 403 So.2d 1214 (La.1981) (trial court constructively denied defendant right to counsel by appointing new attorney on the day of trial who presented no *857 defense, but only cross-examined the State's witnesses).
In the instant case, even if we assume counsel had four weeks to prepare for the penalty phase of defendant's trial, we cannot say that such an extended period of time was so unreasonably short as to call into question the basic fairness of the proceeding. The situation at hand falls outside the ambit of Simpson and Durio because defense counsel had an adequate amount of time to prepare for trial. Thus, for the trial court's denial of the motion for continuance based on this ground to constitute reversible error, defense counsel must be able to demonstrate specific prejudice resulting from the denial. Counsel here has not made any specific allegations of prejudice resulting from the denial of this particular motion for continuance, nor has he shown how the mitigation defense was in any way impaired by the denial. See generally State v. Dupre, 408 So.2d 1229, 1231 (La.1982). The defense presented seven witnesses in the penalty phase, including a social worker who prepared defendant's psychosocial history, a forensic psychiatrist who examined defendant, defendant's sister, his mother, his former employer, his neighbor and a childhood friend. Defendant's penalty phase counsel obviously had adequate time to develop mitigating evidence. We therefore cannot say either that the trial court abused its discretion in denying the motion for continuance on this ground or that the denial of the motion deprived defendant of a fair trial. The denial did not result in any specific material prejudice to defendant. This portion of this assignment of error lacks merit.
Defense counsel also argues defendant's guilt phase attorney had insufficient time to prepare and thus the motion for continuance to allow counsel additional time to prepare should have been granted. Here, counsel who conducted the guilt phase of defendant's trial was appointed by the trial court to represent defendant on September 28, 1995, eleven months prior to trial. Rec. vol. 1, p. 39. Defense counsel, however, represented to the court that she was only notified of her appointment "at the end of April," some four months before defendant's trial. Rec. vol. 2, p. 332. Even so, defense counsel had an adequate amount of time to prepare for defendant's trial. While four months is not an extensive time to prepare for a capital case, it nonetheless appears sufficient. Furthermore, counsel has not made any specific allegations of prejudice resulting from the denial as to this counsel. Because we cannot say the trial court abused its discretion in denying the continuance on this ground and because no prejudice resulting from the denial has been shown, this portion of the assignment of error lacks merit.
In a related argument, defendant argues that both the time constraints appointed counsel acted under and the mental health problems of defendant combined to destroy defendant's Sixth Amendment right to reasonably competent counsel in the guilt phase of trial under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A claim for ineffective assistance of counsel is generally raised in an application for post-conviction relief. State v. Burkhalter, 428 So.2d 449, 456 (La.1983). Post-conviction proceedings enable the district judge to conduct a full evidentiary hearing on the matter. State v. Hamilton, 92-2639, p. 4 (La.7/1/97), 699 So.2d 29, 31; State v. Seiss, 428 So.2d 444, 449 (La.1983). This court has, however, addressed ineffective assistance of counsel claims on direct review where the record discloses the evidence necessary to decide the issue. State v. Ratcliff, 416 So.2d 528, 530 (La.1982). In the present case, however, if the trial court finds on remand that defendant was not able to assist his counsel at the time of trial and therefore reverses defendant's conviction and sentence, defendant's argument of ineffective assistance of counsel at the guilt phase becomes moot. If, on the other hand, the trial court finds defendant was competent at the time of trial, the *858 issue of ineffective assistance of counsel is relegated to post-conviction proceedings as the record does not contain sufficient evidence for this court to fully explore this issue.
Prior to trial, the defense also moved for a continuance based on the fact that one of defendant's mental health experts "has been unable to complete [psychological] testing of the defendant due to the time constraints attendant to the August 27 trial date." In a related motion heard at the same time, defendant again asked for a continuance because this same expert, Dr. Elaine Salzer, would be out of town during the trial. The trial court denied both motions without reasons.
Dr. Salzer's report was proffered by the defense at the penalty phase of defendant's trial. The report indicated that defendant was tested August 22, 1996. The report authored by Dr. Salzer appears to be comprehensive and does not suggest that her findings were incomplete or inadequate due to a lack of time before trial. Consequently, we cannot conclude that the trial court abused its discretion in failing to grant a continuance on this ground or that defendant was prejudiced by the denial.
Defendant also argues the trial court should have granted a continuance because Dr. Salzer was out of town for the duration of the trial and he wanted to call her as a witness during the penalty phase of his trial. Although the State offered to stipulate that Dr. Salzer would testify consistent with her report, the defense refused to so stipulate, claiming it did "not want this report coming in without her testimony." Rec. vol. 6, p. 1374. The trial court denied the motion for the continuance and accepted defense counsel's proffer of the report for purposes of appellate review.
A motion for a continuance based on the absence of a missing witness must state the facts to which the absent witness is expected to testify, showing the materiality of the testimony and the necessity for the presence of the witness at the trial, circumstances showing the availability of the witness at the time to which the trial is deferred, and facts showing due diligence used in an effort to procure attendance of the witness. La.C.Cr.P. art. 709; State v. Rogers, 553 So.2d 453 (La.1989); State v. Jackson, 450 So.2d 621 (La.1984). Generally, the "due diligence" requirement of Article 709 is not satisfied when defense counsel fails to have the potential witness subpoenaed. State v. Atkins, 360 So.2d 1341 (La.1978); State v. Terry, 359 So.2d 172 (La.1978); State v. Bennett, 341 So.2d 847 (La.1976); State v. Elias, 230 La. 498, 89 So.2d 51 (1956). The record contains no evidence that Dr. Salzer was ever subpoenaed or that defendant attempted to obtain her presence in any way. Furthermore, at the hearing on the motion to continue the penalty phase based on Dr. Salzer's absence, the State argued that she had never been subpoenaed and the defense did not contradict this assertion. As such, we cannot say that the trial court abused its discretion in failing to continue the penalty phase based on Dr. Salzer's absence.

Assignment of Error No. 5
Finally, in his last assignment of error, defendant argues the trial court erred in denying his motion for a new trial filed pursuant to La.C.Cr.P. art. 851.[20] *859 Defendant made the same allegations in his motion for a new trial that he presents in the instant appeal: (1) that the verdict is contrary to the law and evidence;[21] (2) that the court's ruling on both written motions, and objections made during the proceedings, show prejudicial error, including a Batson motion made during voir dire but then specifically supplemented to include other court rulings; (3) that the court erred in failing to continue the trial to allow defense counsel time to prepare; (4) that the court erred in failing to continue the trial to give defense counsel sufficient time to develop a defense of insanity, then specifically supplemented to include the defense's inability to communicate with the defendant at trial and (5) that the ends of justice would be served by the granting of a new trial, both as to the guilt phase and penalty phase.[22] However, as discussed above, with the exception of the trial court's denial of defendant's motion for continuance based upon his alleged inability to communicate with his counsel, there is no error in the trial court's denial of his motion for a new trial. Cf. State v. Strickland, 94-0025, p. 51 (La.11/1/96), 683 So.2d 218, 239 (harmless errors, however numerous, do not aggregate to reach the level of reversible error); State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364 (unpub'd appx.); State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116; State v. Copeland, 530 So.2d 526, 544 (La.1988) (citing State v. Graham, 422 So.2d 123, 137 (La. 1982)); State v. Sheppard, 350 So.2d 615, 651 (La.1977); see also State v. Smith, 95-1826, p. 20 (La.App. 1 Cir. 9/27/96), 681 So.2d 980, 994; Foster v. State, 639 So.2d *860 1263, 1303 (Miss.1994) (finding no "near errors" and so rejecting cumulative error analysis). Cf. Mullen v. Blackburn, 808 F.2d at 1143, 1147 (5th Cir.1987) (court rejects cumulative error claim and finds that "twenty times zero equals zero"). Those assignments of error which arguably merit the grant of a new trial and reversal of defendant's conviction and/or sentence are thoroughly treated above. Accordingly, this assignment of error is without merit.

CAPITAL SENTENCE REVIEW
Under La.C.Cr.P. art. 905.9 and La.S.Ct.R. 28, this court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, the court considers whether the jury imposed the sentence under influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender. In the instant case, the district judge has not submitted a Uniform Capital Sentence Report (USCR) but the Department of Corrections has submitted a Capital Sentence Investigation Report (CSIR). In addition, the State and the defendant each filed a Sentence Review Memorandum.
The CSIR indicates that defendant is a black male born on March, 21, 1962. He was thirty-four years old at the time of the offense. He was born in Catahoula Parish. His mother and father had a common-law marriage. Defendant, the youngest of seven brothers and sisters, was five years old when his parents split up in 1967. His mother never remarried and he had no real father. Apparently, defendant's sisters took on most of the child rearing responsibilities. However, according to the CSIR, the defendant became closer to his father later in life. Defendant was a "C" student in school, but got "A's" in math. He completed the 12th grade and joined the Marine Corps. He served four years active duty and two years inactive duty and was honorably discharged. Defendant worked for Conti Fleeting for four years as a welder/fitter. He also worked as a truck driver and did waterproofing. He held a job as a security guard for Capitol Protective in 1985 and 1986. CSIR, p. 5.
Defendant and Mary Snyder were married for eight years. They have three children. Quinan, age 11; Allen, Jr., age 9; and Jordan, age 7. According to the CSIR he claims that his wife is drinking and using drugs and believes that he would be a danger to her if he is released. He claims that people have lied to her, telling her that he will be eligible for parole in ten years. CSIR, p. 5.
The CSIR also indicates that the defendant is in fair health. Since being in jail, defendant has developed prostatitis and is having problems with his legs. CSIR, p. 5. Defendant admits to using cocaine in 1989 and also admits the use of marijuana. He successfully completed a substance abuse program several years ago and has been opposed to drugs ever since. CSIR, p. 6.
The defendant has received psychiatric treatment in jail. First, court appointed doctors conducted a competency exam in August of 1996. They found that defendant could understand the proceedings against him and was able to assist in his own defense. According to the CSIR, defendant informed the examining physician that he felt as though his mother emotionally and physically abused him, and claimed that both of his parents drank a lot. He also told doctors of his wife's history of promiscuity noting that she had a five month old child before their marriage and was pregnant by him at the time they married. He recalled that he would not marry his wife until after the child was born for fear that it was not his. CSIR, p. 6. Defendant also indicated to the doctors that he had never abused drugs or alcohol but that he did drink large amounts of beer after work during 1986 and 1987, and suffered from black outs. Doctors diagnosed defendant with depression and prescribed *861 Sinequan, which defendant took through most of his incarceration. The CSIR notes that defendant's depressive disorder is likely secondary to the stress of incarceration and anxiety regarding his situation. CSIR, p. 6.
The Department of Corrections contacted members of the defendant's family to obtain a more complete record of defendant's social history. They spoke with Murray Smith, a friend of the defendant, who indicated that he had known him all of his life. He stated that defendant, "is a very nice guy ... [and they'd] done a lot of things together in their time." CSIR, p. 6. He also informed the interviewer that defendant does not do drugs anymore, that he had been "clean and straight" for twelve years. He also indicated that he knows defendant's wife well and thinks that defendant's case was poorly handled. CSIR, p. 6. The interviewer also spoke with Winnie Walker, defendant's mother. She stated that since defendant had been in jail, his wife sold all of his clothes and that a man named "Ralph" moved into his house. She claimed that the defendant's children are with her all the time because they do not want to return to their mother. She believes that the children are intelligent and know what is going on. Additionally, she does not believe defendant received a fair trial on March 26, 1999. CSIR, p. 6.
The CSIR shows that defendant had no juvenile record but received five years probation for distribution of cocaine on September 27, 1989. Defendant successfully completed his probation and attended a drug abuse clinic. CSIR, p. 5.
In the instant case, the state presented only one aggravating circumstance, that defendant knowingly created a risk of death or great bodily harm to more than one person. The jury agreed. La.C.Cr.P. art. 905.4. The defense presented seven witnesses during the penalty phase.

Passion, Prejudice, and other Arbitrary Factors
The defendant contends that three elements injected passion, prejudice, arbitrariness, and caprice into the proceedings: (1) his defense attorneys failed to present evidence of his "mental defect" during the guilty phase of the trial, thus making the evidence of his depressed state during the crime seem like a last ditch effort to save his life during the penalty phase of the trial; (2) the trial court improperly admitted highly prejudicial photographs; and (3) the district attorney impermissibly appealed to prejudice during his closing arguments by referring to the O.J. Simpson case. All of these factors were discussed in depth above in the individual assignments of error and are without merit. An independent review of the record does not provide any other indication of passion, prejudice or any other arbitrary factors.

Aggravating Circumstances
At trial, the State argued that one aggravating circumstances existed: the offender knowingly created a risk of death or great bodily harm to more than one person. The jury found the existence of this circumstance.
As previously discussed in defendant's claim of insufficient evidence, the evidence presented by the State was sufficient to sustain the finding of all of the elements of first degree murder. The evidence also demonstrated that the defendant knowingly created a risk of death or great bodily harm to more than one person, the victim, Howard Wilson, and the defendant's estranged wife, Mary Snyder. La.C.Cr.P. art. 905.4(A)(4). Consequently, the defendant's sentence of death is firmly grounded on the finding of this aggravating circumstance.

Proportionality
Although the federal Constitution does not require a proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990). This court, however, has vacated only one capital sentence on the ground that it was disproportionate *862 to the offense and the circumstances of the offender, State v. Sonnier, 380 So.2d 1, 7 (La.1979), although it effectively decapitalized another death penalty reversal on other grounds. See State v. Weiland, 505 So.2d 702 (La.1987) (on remand, the state reduced the charge to second degree murder and the jury returned a verdict of manslaughter).
This court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. Sonnier, supra.
The State's Sentence Review Memorandum reveals that since 1976, jurors in the 24th Judicial District, have returned a guilty verdict for a first degree murder charge in 65 cases, including the defendant's case, and recommended imposition of the death penalty 18 times, including the current case. Ten[23] of the 18 cases in which the jury returned a death sentence involved as an aggravating factor the risk of death or great bodily harm to more than one person. The first of the ten cases is that of Benjamin Berry, who fatally shot a law enforcement officer during a bank robbery. Berry was executed in 1987. State v. Berry, 391 So.2d 406 (La. 1980); cert. denied, 451 U.S. 1010, 101 S.Ct. 2347, 68 L.Ed.2d 863 (1981). The second case is that of Tyronne Lindsey, who killed a shopper in the Oakwood Mall parking lot. After numerous resentencings and a retrial, Lindsey was once again sentenced to death. State v. Lindsey, 543 So.2d 886 (La.1989); cert denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990). The third case is that of Jimmy Robinson, who killed the husband of an apartment complex manager in her presence during an armed robbery. This Court affirmed the conviction but vacated the death sentence and, on remand, Robinson received a life sentence. State v. Robinson, 421 So.2d 229 (La.1982). The fourth case is that of Leslie Lowenfield who shot and killed his ex-girlfriend, her daughter, parents and current boyfriend. This court affirmed the conviction and sentence. State v. Lowenfield, 495 So.2d 1245 (La.1985), cert. denied Lowenfield v. Louisiana, 476 U.S. 1153, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986). The fifth case is that of Glen Keith Weiland, who stabbed his girlfriend and her ex-husband, killing the female victim. This court reversed Weiland's first degree murder conviction. State v. Weiland, 505 So.2d 702 (La.1987). On retrial the state amended the indictment to second degree murder. The jury subsequently convicted defendant of manslaughter and he was sentenced to 21 years imprisonment at hard labor. The sixth case is that of Robert Tassin, who shot two victims in the course of an armed robbery/drug deal, one fatally. The court affirmed his conviction and sentence. State v. Tassin, 536 So.2d 402 (La.1988). The seventh case is that of Manuel Ortiz, a murder-for-hire case in which the defendant employed a "hitman" to kill his wife and her friend. This Court affirmed defendant's conviction and sentence. State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922. The eighth case is that of Julius Lucky, who shot two of his co-workers, one fatally, during the course of an armed robbery. State v. Lucky, 96-1687 (appeal pending before this Court). The ninth case is that of Edward Harris, who shot and killed two *863 pedestrians in a drive-by shooting. State v. Harris, (appeal not yet filed before this court). Last is the case of Damon Thibodeaux who kidnapped, raped and killed Crystal Champagne, a fourteen-year-old girl. State v. Thibodeaux, 98-1673 (appeal pending before this court).
The brief outline of the cases above provides strong support for an argument that the death penalty imposed in this case is not disproportionate. In the event that the court decides to resort to use of a statewide basis of comparison, the defendant would be unlikely to fare any better. Cases are legion in which this court has affirmed capital sentences based primarily on the jury's finding that the defendant created the risk of death or great bodily harm to more than one person. State v. Baldwin, 96-1660 (La.12/12/97), 705 So.2d 1076 (affirming death penalty based on aggravating factor that defendant created a risk of death or great bodily harm to more than one victim where the defendant shot and killed his estranged wife and the three men with her at the time); State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116 (affirming death penalty where jury found aggravating circumstance that defendant knowingly creating risk of death or great bodily harm to more than one person where defendant murdered his estranged girlfriend and severely wounded her mother); State v. Sanders, 93-0001 (La.11/30/94), 648 So.2d 1272 (Defendant killed estranged wife and her new boyfriend, affirmed death penalty based on aggravating factor that defendant created a risk of death or great bodily harm to more than one victim).

DECREE
The conviction and sentence of death are conditionally affirmed on the evidence in the record on appeal. However, a final determination of the appeal is pretermitted, and the case is remanded to the district court for a determination of whether a meaningful inquiry into defendant's competence at the time of trial is now possible and, if so, for an evidentiary hearing and determination on this issue. Defendant's right to appeal from an adverse decision is reserved.
LEMMON, J., concurs in remanding the case to the district court for a reopened hearing on competency to proceed, but otherwise dissents from affirming the conviction and sentence, and assigns reasons.
VICTORY and TRAYLOR, JJ., concur in affirming the defendants conviction and sentence but dissent from the remand.
JOHNSON, J., dissents and assigns reasons.
LEMMON, J., concurring in part and dissenting in part.
The racial bias overtones of the entirety of this rather simple trial require reversal of the conviction and sentence of a black defendant tried by an all-white jury.
Early in the voir dire, the prosecutor accepted a black juror (Brooks). When two other black jurors were peremptorily struck, defense counsel noted their race, but did not attempt to establish a prima facie case of discrimination necessary to make a Batson challenge, apparently because one black juror had already been accepted. However, the prosecutor, after peremptorily striking a third black juror, also backstruck Brooks. When required by the judge to give a race-neutral explanation for striking Brooks, the prosecutor stated what essentially was no reason at all, asserting that the juror would miss class as a student teacher and may try to hurry the trial. However, on the previous day when Brooks was accepted, the dean of the school told the judge's clerk that Brooks' missing class would not be a problem, and the prosecutor apparently did not think it would be a problem, since he initially accepted Brooks. The backstriking of Brooks, along with the peremptory challenging of all four of the other blacks on the jury venire, resulted in an all-white jury, and the timing of the Brooks backstrike made the early acceptance of Brooks suspect.
*864 Whether the conviction and sentence should be reversed on the Batson issue is a very serious issue. However, the prosecutor's intention to utilize racial bias became crystal clear when he commented during closing argument in the penalty phase that O.J. Simpson "got away with it" in the California verdict that had been rendered shortly before this trial.
Prior to trial, the defense moved to exclude any reference to the Simpson verdict, arguing that this prosecutor "has been all over two parishes talking about `this is his O.J. Simpson case'" and that any reference to the Simpson verdict, overwhelmingly unpopular in national polls of white citizens, would be extremely prejudicial. The prosecutor did not attempt to explain the relevance of any reference to the Simpson verdict, but gave "my word" that "I will not, at any time during the course of the taking of evidence or before the jury in this case, mention the O.J. Simpson case." The judge stated that, "[b]ased on [the prosecutor's] representations, I'm going to deny your motion."
The prosecutor did not mention the Simpson verdict until closing argument in the penalty phase when he, in effect, urged the all-white jury not to let this O.J. prototype "[get] away with it." The acquittal of Simpson, a high profile black defendant who had threatened to kill himself before his arrest, was totally irrelevant to any issue in the penalty phase of the present case.[1] The prosecutor's attempt to inflame the jury by characterizing Simpson's acquittal as "he got away with it" was highly prejudicial to this black defendant.
I find compelling the rhetorical question by defense counsel in oral argument before this court, asking whether the prosecutor would have ranted about O.J.'s getting away with it if he had not backstruck the only black juror toward the end of voir dire.[2] Racially inflammatory tactics, such as those in the present case, should not be tolerated, even at the expense of the reversal of convictions and sentences obtained by their use. This is the only means this court has to halt similar tactics in the future, perhaps in the guilt phase of the trial of an innocent person.
The senseless carnage by this defendant does not make this a very sympathetic case for the defense. Nevertheless, this defendant is constitutionally entitled to a fair trial that is as free as possible of any aura of racial bias. He did not receive such a trial in this case.
VICTORY, J., concurring in part and dissenting in part.
I agree with all other aspects of the majority opinion, but I dissent from that part of the opinion which finds the trial court erred in failing to investigate defendant's request for a continuance based upon a claim of incompetence and remands the case for a hearing to determine whether a retrospective determination of defendant's competence is possible. I would unconditionally affirm defendant's conviction and sentence.
I note the following from the record:
(1) Defense counsel's motion for a sanity commission in late July, 1996, about a month before trial, contains substantially the same complaints of mental incapacity to proceed as the motion for continuance filed in mid-August, 1996.
(2) A full sanity hearing was held on August 8, 1996. According to Drs. DePrato and McDermott's report:
[Sinequan] had been effective in abating his depression. However, as his trial *865 date approaches, Mr. Snyder's anxiety has escalated. As a consequence of his symptoms, he occasionally has difficulty focusing on questions asked of him and becomes mildly circumstantial and tangential. He is able to be re-directed and can focus his attention when he is provided structure. The results of this evaluation do not provide evidence of cognitive disturbances. He exhibited symptoms consistent with a depressive disorder which is likely secondary to the stress of incarceration and anxiety regarding his current situation. Such symptoms do not interfere with his ability to understand the proceedings against him or to assist in his defense. It is our opinion that Mr. Snyder may benefit from a change in medications. It appears that Sinquan has been maintenanced at a low dose secondary to side effects and may worsen his prostatitis. It is possible that he may benefit from an antidepressant such as Prozac or Zoloft, which can be increased to a level to better control his depressive symptoms. Consequently, it is our opinion, at the time of the evaluation, Mr. Snyder is able to understand the proceedings against him and is able to assist in his defense.
(3) Defendant's medication was changed to Prozac on August 16, 1996. There is no evidence that the change to Prozac made defendant's depression worse. In fact, Dr. DePrato testified at the sanity hearing that "... some people begin to respond immediately while the full maximum potential can take about six weeks." By the time of defendant's trial, he had been on Prozac for almost two weeks.
(4) At the hearing on defendant's motion for continuance held on August 20, 1996, defendant again did not call his treating physician, Dr. Richoux, as a witness, but proffered his letter dated August 16, 1996, noting the change in medication three days earlier and stating that "... Snyder continues to display severe depressive symptoms that may interfere with his ability to assist his attorney...." Yet, Drs. DePrato and McDermott used Dr. Richoux's records of treatment of defendant at JPCC in their evaluation of defendant in their report to the court on August 2, 1996.
Viewed in a light most favorable to defendant, all the hearsay letter possibly shows is that Dr. Richoux may have considered defendant's condition to be worse than Drs. DePrato and McDermott did before the change in medication, and that, in his opinion, the depression may interfere with his ability to assist his attorney. There is no suggestion that Dr. Richoux has ever evaluated defendant's competency to stand trial under the Bennett factors, as did Drs. DePrato and McDermott in their exhaustive report to the trial court dated August 2, 1996. Further, it is obvious that Dr. Richoux changed defendant's medication at the suggestion of Drs. DePrato and McDermott, who felt that defendant might benefit from Prozac, although Sinequan prescribed by Dr. Richoux had already been effective in abating his depression.
(5) Defense counsel acknowledged that defendant was not incompetent to proceed.
The majority states that "[i]n contrast to the Lopez case, the trial court in this case did not undertake any investigation into the allegations made by defense counsel that defendant was having difficulties communicating with her." Maj. Op. at 853. Of course, this is not accurate. These allegations were made by defense counsel in the motion for a sanity commission and the trial court received extensive evidence on the subject at the August 8, 1996 sanity hearing from the testimony of Dr. DePrato and the report presented by Drs. DePrato and McDermott. These doctors discussed the Bennett factors at length in their written report and concluded that although the defendant "occasionally has difficulty focusing on questions asked of him and becomes mildly circumstantial and tangential... such symptoms do not interfere with his ability to understand the proceedings against him or to assist in his defense."
*866 Defendant had every opportunity to present evidence of his incompetency at the sanity hearing he provoked, but chose not to present any witnesses. The evidence presented by the State at that hearing very strongly proves defendant had the ability to proceed with trial. Merely because on recommendation of the very doctors who found him competent to proceed, his medication was changed to make him even more competent to proceed, does not suggest that his competency was or is in question. The trial court allowed defense counsel to testify as to "anything new" of a non-confidential nature that showed defendant was not able to assist her. Instead, she simply continued to reiterate that defendant wanted six weeks to receive the full benefit of the new medication, a fact presented to the trial judge by Dr. DePrato on August 8, 1996 at the sanity hearing before he ruled that defendant had the capacity to proceed.
TRAYLOR, concurs in part and dissents in part for reasons assigned by VICTORY, J.
JOHNSON, J., Dissenting.
I would have more confidence in the fairmindedness of this jury and the jury's pronouncement of the death sentence, had the state not used its peremptory challenges to exclude every African American juror, resulting in an all white jury for this black defendant. In my view, this violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), coupled with the prosecutor's inflammatory and prejudicial comparison of this case to the O.J. Simpson trial, require that we set aside the death sentence and remand the case for resentencing.
The Sixth Amendment to the United States Constitution gives a criminal defendant the right to a trial by a jury of his peers. I still believe that racial discrimination in the jury selection process offends the Equal Protection Clause of the Fourteenth Amendment and a pattern of strikes against African American jurors still gives rise to an inference of discrimination. Once the inference of discrimination is present, the prosecutor then has the burden of articulating a race-neutral explanation for striking the African American jurors. The trial judge serves as the gatekeeper, ensuring that racial prejudice, which impedes the securing of equal justice, does not invade our judicial system. As the gatekeeper, the trial judge must decide whether the prosecutor has articulated a genuine concern, or whether the reason articulated is merely a guise to accomplish his/her discriminatory purpose. Verbalized facially neutral reasons can be a pretext for conscious or unconscious racism.
In the present case, the prosecutor's action in accepting the first African-American juror seems to have been a tactic to keep defense counsel from raising Batson challenges to the subsequent exclusions. Nonetheless, defense counsel noted in the record which excluded jurors were African-American. The Batson challenges to the remaining three African-American jurors, including the one juror who was accepted and later backstruck, were overruled by the trial court. The trial court accepted the prosecutor's "race-neutral" explanations and the majority found them to be "plausible, supported by the record and race neutral."
The prosecutor's discriminatory intent in excluding all African-Americans from the jury was evidenced by his reference to the O.J. Simpson trial during closing arguments. In State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272, 287, we recognized that "for a Batson challenge to succeed, it is not enough that a racially discriminatory result be evidenced; rather, that result `must ultimately be traced to a racially discriminatory purpose.'" Here we have a racially discriminatory result. An all-white jury selected by peremptorily excluding the five African-Americans from the venire, and the prosecutor's racially discriminatory purpose of inflaming the jury by referring to O.J. Simpson getting away with murder in California. Because of the nationwide media focus on O.J. Simpson, the defense made a pre-trial motion *867 to exclude any references to the O.J. Simpson case. This motion was denied by the trial judge based on the prosecutor's assurance that he would not, at any time during the course of taking evidence or before the jury, mention the O.J. Simpson case.[1] It is blatantly clear that the prosecutor did not intend to keep his word. The prosecutor had no need to make reference to this defendant not getting away with murder during the penalty phase of the trial. At this point, the defendant had already been convicted of the crime, so there was nothing for him to "get away with." The prosecutor utilized the O.J. Simpson verdict to racially inflame the jury's passion to sentence this defendant to death. Such tactics leave no doubt in my mind that the prosecutor had a racially discriminatory purpose for excluding the African-American jurors.
The defense argues that the prosecutor's comments on the O.J. Simpson verdict to this all white jury were devastating and requires that the conviction be reversed. While there is much evidence that the majority of white Americans believe O.J. Simpson was guilty of murdering his wife and that he "got away with it," the prosecutor's improper comments during the penalty phase do not implicate the trial phase. The defendant's own confession, plus the testimony of his ex-wife, Mary Snyder who survived this brutal attack, along with that of Gwen Williams, the witness who came to the aid of Ms. Snyder during the attack, support the defendant's conviction of first degree murder. The prosecutor's improper and clearly inflammatory comments did, however, create a substantial risk that the death penalty would be imposed. In my opinion, the defendant's death sentence should be set aside and this matter remanded for resentencing.
For the aforementioned reasons, I respectfully dissent.
NOTES
[*] CALOGERO, C.J., not on panel. See Rule IV, Part 2, Section 3.
[1] Because each of defendant's five assignments of error was briefed and argued, this opinion contains no unpublished appendix.
[2] Specifically, the jury found that:

The offender knowingly created a risk of death or great bodily harm to more than one person.
Rec. vol. 1, p. 196.
[3] No evidence of sexual activity between Mary Snyder and Howard Wilson was presented in the guilt phase of defendant's trial. In the penalty phase, however, two state experts testified that defendant told them that when he opened the car door, he saw his wife performing a sexual act with the victim. Rec. vol. 7, pp. 1534, 1546.
[4] The defense claims that defendant came upon Mary Snyder and Howard Wilson while they were engaged in a sexual act in Wilson's car. Appellate counsel argues that had this information been fully investigated and presented to the jury, the mitigatory factors of provocation sufficient to deprive an average person of his self-control and cool reflection would have been proved by a preponderance of the evidence. However, no such evidence was presented by the defense in the guilt phase of defendant's trial. Counsel also argues in this assignment of error that the trial court erred in denying defendant a continuance which would have allowed defense counsel time to investigate this aspect of a manslaughter defense and would have allowed defendant time to stabilize on new anti-depressant medication. This argument is treated in our discussion of defendant's assignments of errors dealing with the trial court's failure to grant a continuance.
[5] La. R.S. 14:31(A)(1) defines manslaughter as:

A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed;
[6] The substantive definition of first degree murder under La. R.S. 14:30(A)(3) differs critically from the aggravating circumstance in La.C.Cr.P. art. 905.4(A)(4). The latter requires proof that the offender "knowingly created a risk of death or great bodily harm to more than one person" while the former requires proof that the offender had the "specific intent to kill or to inflict great bodily harm upon more than one person." A finding under La. R.S. 14:30(A)(4) will always support the existence of the aggravating circumstances in Article 905.4(A)(4), but the converse is not necessarily true. See State v. Ortiz, 96-1609, p. 17 (La.10/21/97), 701 So.2d 922, 933 ("For purposes of the guilt phase of the trial, it was not sufficient for the jury to find that defendant merely created a risk of the death of more than one person. The statute required the jurors to find that defendant actively desired the result that followed from his actions."). In this case, rational jurors could find on the evidence that defendant specifically intended to kill or to inflict great bodily harm upon Howard Wilson and Mary Snyder during a consecutive course of conduct which resulted in the death of at least one person and that defendant had therefore committed first degree murder as defined by La. R.S. 14:30(A)(4). State v. Bourque, 622 So.2d 198, 243 (La.1993); State v. Johnson, 541 So.2d 818, 826 (La.1989); State v. Williams, 480 So.2d 721, 726 (La.1985). A fortiorari, that evidence also supported the jury's finding of the aggravating circumstance in Article 905.4(A)(4) at the penalty phase of trial.
[7] When the State excused Greg Scott, defense counsel stated, "I just need to note Mr. Scott is African American. I'd note that for the record. I'm not asking for anything." Rec. vol. 4, p. 831. Later, the State excused Thomas Hawkins, Jr. and defense counsel stated, "Note for the record that Mr. Hawkins is a black juror." Rec. vol. 4, p. 901. The prosecutor responded by asking, "Are you making a challenge that you want me to make." Rec. vol. 4, p. 901. Defense counsel Vasquez then interjected, stating, "She didn't object." Rec. vol. 4, p. 901. No further discussion of these two jurors occurred.
[8] Defendant also claims in his brief that his trial attorneys rendered ineffective assistance of counsel in failing to lodge a Batson objection to the State's use of peremptory challenges against Greg Scott and Thomas Hawkins, Jr. This contention will be addressed later in this opinion.
[9] La.C.Cr.P. art. 841 provides in pertinent part that "[a]n irregularity or error cannot be availed of after the verdict unless it was objected to at the time of occurrence."
[10] After the trial court allowed the challenge, defense counsel stated for the record:

Your Honor, Mr. Brooks was the first African American chosen. The State subsequently proceeded to cut, at this point, it's either three or four and the record will reflect which it is, and the State has now gone back and cut the only African American that they chose. So that that [sic] needs to be on the record.
Rec. vol. 4, p. 956.
[11] As the Allen Court noted, the impact of the Batson rule is lessened because of the presence of other procedures that protect a defendant's interest in a neutral factfinder:

Voir dire examination is designed to identify veniremen who are biased so that those persons may be excused through challenges for cause. Moreover, the jury charge typically includes instructions emphasizing that the jurors must not rest their decision on any impermissible factor, such as passion or prejudice.
Allen, 478 U.S. at 259 n. 2, 106 S.Ct. at 2881 n. 2. These other mechanisms existed prior to the Batson decision, "creating a high probability that the individual jurors seated in a particular case were free from bias." Allen, 478 U.S. at 259, 106 S.Ct. at 2881.
[12] Although defense counsel does not refer to the specific exhibit numbers, the pictures described in the brief relate to State's Exhibits Nos. 13, 14 and 15.
[13] When asked to describe the knife he brought with him when he was looking for his wife, defendant told police:

Well it was a brown and blue handle. It's a steak knife I believe.... I'm not familiar with, ha, with knives in a way.
Transcribed Audio Statement, p. 6.
[14] In Chapman and Sullivan, the harmless error rule was applied to the jury's decision to convict rather than to its sentencing decision. Nevertheless, the harmless error analysis has subsequently been used in reviewing the alleged prejudicial impact of errors in the penalty phase of capital trials. See State v. Lee, 524 So.2d 1176, 1192 n. 4 (La.1987) (on rehearing).
[15] La.C.Cr.P. art. 642 provides:

The defendant's mental incapacity to proceed may be raised at any time by the defense, the district attorney, or the court. When the question of the defendant's mental incapacity to proceed is raised, there shall be no further steps in the criminal prosecution, except the institution of prosecution, until the defendant is found to have the mental capacity to proceed.
(Emphasis added.)
[16] The State bears this burden because a nunc pro tunc competency hearing is essentially "a harmless error determination in disguise." James v. Singletary, 957 F.2d 1562, 1571, n. 14 (11th Cir.1992). The James court reached this conclusion because "Pate, in essence, established a rebuttable presumption of incompetency upon a showing by a habeas petitioner that the state trial court failed to hold a competency hearing on its own initiative despite information raising a bona fide doubt as to the petitioner's competency. According to Pate, the state could rebut this presumption by proving that the petitioner in fact had been competent at the time of trial." Id. at 1570 (footnote omitted).
[17] We note that defendant was examined by Drs. Richoux, Deland and Salzer during this time period. Additionally, there is some implication in the record that Dr. Hannie examined defendant during this period. Rec. vol. 2, p. 472. There is no indication when defendant was examined by Dr. Davis, although his testimony and records would certainly be relevant if he also examined defendant at the time he was allegedly unstabilized on his medication. The testimony of doctors or mental health experts who conducted mental examinations close to the trial date increase the probability that the nunc pro tunc hearing will not be unduly speculative. United States v. Makris, 535 F.2d 899, 904 (5th Cir.1976). One reason we believe remanding this case to the trial court for it to consider whether a meaningful inquiry into defendant's competence can still be had is appropriate is because defendant was examined by several mental health professionals close to his trial date.
[18] We need not address whether the trial court abused its discretion in denying the continuance based on defendant's alleged inability to communicate with his counsel because if defendant is found competent after a nunc pro tunc hearing, the denial of the continuance did not constitute an abuse of the trial court's discretion and if defendant is found incompetent, or if a meaningful inquiry cannot be had, the denial of the continuance was obviously an abuse of discretion and per se prejudicial.
[19] Defendant represents that prior to that time he was represented by Dale Cannizzaro, who withdrew from the case for medical reasons without filing any pretrial motions in the case.
[20] La.C.Cr.P. art. 851 states:

The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
(1) The verdict is contrary to the law and the evidence;
(2) The court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error;
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty;
(4) The defendant has discovered, since the verdict or judgment of guilty, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before the verdict or judgment; or
(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.
[21] Defendant frames one of his claims as an error by the trial court in denying his motion for new trial under La.C.Cr.P. art. 851(1) (trial court shall grant a new trial when the verdict is contrary to the law and the evidence) and also asks the court to examine the evidence under the Jackson v. Virginia standard. However, a motion for new trial presents only the issue of the weight of the evidence, see Tibbs v. Florida, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982) (setting aside a verdict as against the weight of the evidence, as opposed to the insufficiency of the evidence, under the Due Process Clause does not bar retrial) and is examined under the so-called thirteenth juror standard under which the trial judge re-weighs the evidence. State v. Voorhies, 590 So.2d 776, 777 (La.App. 3 Cir.1991). The question of sufficiency is properly raised by a motion for post-verdict judgment of acquittal. La.C.Cr.P. art. 821; State v. Demery, 28,396, p. 6 (La.App. 2 Cir. 8/21/96), 679 So.2d 518, 522. But see Article 851 comment (d) ("[i]t is the duty of the trial judge to pass upon the sufficiency of the evidence" once ground (1) is raised under Article 851).

In the instant case, the constitutional issue of sufficiency is treated in assignment of error number 1 because the denial of a motion for new trial based upon La.C.Cr.P. art. 851(1) is not subject to review on appeal. State v. Skelton, 340 So.2d 256, 259 (La.1976) ("[W]e have uniformly held that a bill of exceptions reserved to the refusal of the trial judge to grant a motion for a new trial based on Article 851(1), relative to sufficiency of the evidence presents nothing for our review.") (citations omitted); State v. Bartley, 329 So.2d 431, 433 (La.1976) ("It is well established in Louisiana that an assignment of error reserved to the denial of a motion for a new trial alleging that the verdict is contrary to the law and the evidence presents nothing for appellate review.") (citations omitted).
[22] It is settled that a judgment on these grounds (invariably denying the motion) is unreviewable by an appellate court, which may review the grant or denial of a new trial only "for error of law." La.C.Cr.P. art. 858. See State v. Toomer, 395 So.2d 1320, 1328 (La.1981) (grant or denial of a new trial under Article 851(5) "presents nothing for this Court's appellate review"); State v. Williams, 343 So.2d 1026, 1037 (La.1977) (same), cert. denied, 434 U.S. 928, 98 S.Ct. 412, 54 L.Ed.2d 287 (1977); State v. Cortez, 503 So.2d 76, 78 (La.App. 5 Cir.1987) (same); State v. Savoie, 448 So.2d 129, 135 (La.App. 1 Cir.1984) (same), writ denied, 449 So.2d 1345 (La. 1984).
[23] Two other cases referred to in the State's Capital Sentencing Memorandum have not yet reached this court. Consequently, whether or not the jury found the aggravating factor of risk of death or bodily harm to more than one person is unknown at this time. The cases are as follows:

Elzie Ball shot and killed a delivery man who attempted to stop the armed robbery of a bar owner and employee in progress when he entered the establishment. State v. Ball, Docket No. 96-4222, Division "C".
Lawrence Jacobs murdered victim and his mother during the course of an aggravated burglary. State v. Jacobs, Docket No. 96-7161, Division "H".
[1] The penalty phase of a capital case focuses primarily on "the circumstances of the offense and the character and propensities of the offender." The Simpson trial, of course, was not a capital case. Therefore, the prosecutor's plea in the penalty phase of this case not to let another murderer "[get] away with it" not only was irrelevant to any penalty phase issue, but was an inaccurate comparison since the murderer in this case was already facing a life sentence as a result of the already rendered verdict in the guilt phase.
[2] Of course, the vote of only one juror would mandate defendant's being sentenced to life imprisonment.
[1] During the hearing on the pre-trial motion to exclude references to the O.J. Simpson case, the following colloquy occurred:

Prosecutor:
Now, certainly, I can assure the Court that I'm not going to get up in my opening voir dire and say, "we're here for the Jefferson Parish O.J. Simpson courtcase." I have no intentions of doing that. I have noperhaps in argument, I don't know. I don't know. It might be inappropriate, but I think it's premature. And I can assure this Court I will make no reference to the O.J. Simpson case at any time during the course of the taking of any evidence in this case.
Defense Attorney:
That'sJudge, evidence is not what I'm worried about. I'm certain he's not going to ask any witnesses, "don't you think this is a whole lot like the O.J. Simpson case?" I'm concerned about Mr. Williams' famous arguments.
. . . .
Defense Attorney:
And I would ask that the court issue a ruling that Mr. Williams is not to refer to this or to make comparisons in any way with the O.J. Simpson case and that he be held in contempt if he does that.
Prosecutor:
Judge, I ask the court to allow me, as an officer of this Court, to conduct this case in the proper manner, but in the way that I see fit. And, I have given the Court my word that I will not, at any time during the course of the taking of evidence or before the jury in this case, mention the O.J. Simpson case.... So, I haveI give the Court my word that I won't do this. I just ask you not to grant this motion.
. . . .
The Court:
Based on Mr. Williams' representations, I'm going to deny your motion.