11 WALTZER, Judge.
Defendant, Jacqueline Bloodworth, appeals her conviction for second degree murder. She argues that the evidence does not support a conviction for murder, but the record supports a conviction for manslaughter.
STATEMENT OF THE CASE
Bloodworth was charged by grand jury indictment on 15 July 1999 with second degree murder, a violation of LSA-R.S. 14:3o.!.[1] She pled not guilty at her 22 July 1999 arraignment. On 14 September 1999, the trial court found probable cause, granted Bloodworth’s motion to suppress in part, and denied it in part. On 19 November 1999, the trial court granted the State’s Prieur motion in part, and denied it in part. Bloodworth was found guilty as charged on 24 February 2000, following trial by a twelve-person jury. On 2 March 2000, the trial court sentenced Bloodworth to life imprisonment at hard labor, without the benefit of parole, probation or suspension of sentence, with credit for time served. The trial court denied her motion to reconsider sentence, and granted her motion for appeal.
REACTS
Beatrice Bonin testified that she had been the great aunt of the victim, Frank Weaver III. Frank Weaver came to live with her and her husband in New Orleans when he was two years old, after his moth *120 er, Bonin’s niece, could no longer support him. Bonin stated that Frank and Penny Weaver were married for twelve years, but had divorced. She recalled that Frank Weaver stopped by her home on Mardi Gras Day, 1999, and she thought that he did not appear to be himself. She said he was always happy when he came to her home, but on that day he was quiet, did not speak very well, and was not interested in her. Bonin said that to her knowledge, Frank Weaver never mistreated his children. Bonin admitted on cross examination that Frank Weaver had moved out of her home when he was eighteen years old, and had not resided with her since then. She knew he drank some, but was unaware of any marijuana use. She did not know anything of his relationship with his children since his divorce.
Dr. Paul McGarry, who was qualified by stipulation as an expert in forensic pathology, performed an autopsy on the body of Frank Weaver. The victim was five-feet-four inches tall, and weighed one hundred and thirty-five pounds. He appeared to have been in good health — lean, muscular, no major illnesses. Dr. McGarry received the body in a blue 40-gallon Rubbermaid plastic storage container covered by a lid held in place by rubber tie-down straps with hooks. The victim was folded sideways, in a right shoulder up position. His head was down in one corner; his legs were pulled up in a fetal position. His knees and arms were in front of him. The victim’s body was wrapped in a gray and white comforter, with a bloody green blanket wrapped around his neck and head. A blood-soaked, torn, red tank top shirt was also wrapped around the victim’s head. Inside the container |3was a manila envelope containing a carpenter’s hammer with blood and hair on it. The victim was dressed in black sweat pants, khaki short pants, and blue underwear. He was not wearing a shirt. He had tennis shoes and white socks on his feet that were spattered with blood. The body and comforter were partially covered by a layer of hardened concrete. Dr. McGarry identified various photographs of the victim, the container, the victim’s clothing, and other evidence found inside the container.
Dr. McGarry found extensive injuries to the victim, from the top of his head to his ankles. The entire forehead and the eyelids were swollen and purple. There was a gash on the forehead, with curved deep tears of the scalp at the hairline and extending over the front of the head. The fractured and fragmented bones of the nose had been driven inward. The victim had blood in his nose, mouth and under his swollen and torn lips. There was a V-shaped indentation where something had been tightly pulled around the victim’s neck with enough force to fracture the bone around his throat, bend the voice box, and compress the airway. There were large bruises from the base of the neck to the lower part of the chest where the outer layers of the skin were scraped away. The same types of injuries were present over the shoulders and down the arms. The victim had eleven fractured ribs. His chest essentially was crushed, apparently by someone stomping him. There were bruises and purple discolorations on the front of the body, from the top of the head to the feet. There were also bruises on the back of the victim’s shoulders, extending down the backs of the forearms to the back of the buttocks. There were bruises Dr. McGarry estimated to be a few days old, as evidenced by the beginning halos of brown discoloration around them. There were hemorrhages to both of the victim’s testicles and his penis, all the way from its base to its tip. These wounds were ^consistent with a stomping. The victim had defensive wounds on the palms of his hands, the backs of his forearms, elbows, *121 shoulders, arras, knees and shins. Dr. McGarry also testified that something had been pushed into the victim’s rectum, tearing tissue in the process.
Dr. McGarry identified the hammer found inside the Rubbermaid container, with hair and blood on its claw, and blood and debris on its head. Four deep gouging bone-fracturing wounds to the victim’s forehead and front of his head were the type that would have been made by a hammer. Dr. McGarry found collapsed, partially empty blood vessels during the autopsy, and said that the victim could have bled over a long period of time many minutes to an hour. He stated that an instrument shown to him by the prosecutor was consistent with the wounds to the rectum. Dr. McGarry was asked whether, in the hour before he said it would have taken for the victim to bleed out, if it was possible that medical treatment would have helped him, and he replied in the affirmative. Bloodworth was requested to stand, and Dr. McGarry replied in the affirmative when asked if it would be consistent with the victim’s injuries if a person her size had repeatedly jumped up and down on his prone body.
Dr. McGarry acknowledged on cross examination that the victim’s blood alcohol level was .06 percent. He characterized that as a low blood alcohol level, though conceding defense counsel’s point that there was a current debate in the legislature concerning whether .08 percent would be the legal limit for operating a motor vehicle while intoxicated. Dr. McGarry also said that a urine test showed that the victim had marijuana in his system. Dr. McGarry stated that the rib fractures had a large amount of blood around them, and were under skin with areas | sof purple and maroon discoloration, indicating that those injuries were inflicted while the victim was alive.
New Orleans Police Department Crimi-nalist Deborah Powell Wesley was qualified by stipulation as an expert in the field of serology. Mrs. Wesley testified that she found blood on a hammer, a red tank top, a garbage bag, a white extension rod, a red T-shirt, a pair of green rubber gloves, a tan towel, a white towel and a shipping box. She found no presence of blood on a pair of slippers, a blue tank top or black shorts, but did find blood on a white undershirt.
New Orleans Police Detective Pete Bowen testified that on 22 May 1999 he was notified of a homicide at 433 South Lopez Street. When he entered the residence Bloodworth was handcuffed, seated on a sofa, and dressed like a man. She was wearing a pair of slippers, a black bottom, a navy blue tank top, and a white T-shirt underneath. In the kitchen area Det. Bowen found the blue 40-gallon Rubbermaid container with what appeared to be a human shoulder blade protruding from under blankets and sheets and wet concrete. Det. Bowen identified photographs of the container, as situated in the kitchen of the residence. He said both Bloodworth and Penny Weaver, the victim’s ex-wife, were arrested that day and booked with second degree murder. Det. Bowen said a cardboard box with blood in it was found underneath the residence. A garbage can in the kitchen contained a metal extension rod, two bloody towels, and a plastic bag that he learned had been tied, around the victim’s head at one point. In the back yard the detective found a blue bucket with dried concrete on the side of it, along with two forty-pound bags of concrete, one half-full, one almost empty. Det. Bowen said a pair of rubber gloves and a 16-ounce claw hammer were found, respectively, on the top of a washing machine and on a shelf in the kitchen. Det. Bowen identified |fia Wal-Mart bag containing *122 fishing tackle and two children’s coloring books recovered from the residence. Penny Weaver’s sister, Debra Coward, later turned over a receipt for these items, dated 22 May 1999, 8:25 a.m. The sister removed the receipt, in the presence of the detective, from a wallet she claimed belonged to Penny Weaver. Det. Bowen found no evidence during his investigation that any of the three children who were living in the residence at the time of the murder had been abused. Debra Coward initiated the investigation when she telephoned police from the residence of her and Penny Weaver’s mother, Jacqueline Self, on 22 May 1999, at approximately 2:20 p.m.
New Orleans Police Sergeant Terrence Phillips testified that he spoke to Blood-worth at the direction of Det. Bowen. He read Bloodworth her Miranda rights, and she made a statement. To the best of his recollection, Bloodworth said that she and Frank Weaver were having an altercation the previous night, and she “kind of lost it and lost control and she wound up beating him to death.” Bloodworth said she had kept a journal of incidents occurring between her and the victim, and she directed him to the place she kept it, underneath her bed. He said the journal began with an entry dated 6 May 1999, and ended with one dated 15 May 1999. Sgt. Phillips subsequently obtained a taped statement from Bloodworth at the First District Police Station, after she waived her rights by signing her name and so indicating on a rights-of-arrestee form. He identified a copy of the transcribed statement, and the tape was played for the jury. Bloodworth gave him a receipt from her pocket for two bags of concrete mix she had purchased at a hardware store. The receipt was dated 22 May 1999, with a time of 9:09 a.m. Sgt. Phillips took a supplemental statement from Bloodworth, and identified a transcript of that statement. That tape was played for the jury. Sgt. Phillips testified on cross ^examination that Bloodworth did not ask for an attorney, and freely confessed her involvement in the death of the victim. She showed him where the journal was located, and informed him that she wrote in it to vent her frustrations.
Cynthia Poolson testified that the victim had been married to her sister, Penny Weaver, and that they had two daughters. Penny Weaver, the victim, their two daughters, Bloodworth, and her son all lived in the S. Lopez Street residence. Poolson testified that in October 1998 Bloodworth bragged to her that she had handcuffed the victim’s wrist and ankle, made him lie on the sofa, and beat him in the back of the head with a “billy stick.” Poolson said she later saw some blood on the sofa. She claimed that she made a complaint regarding this incident to “Crime Stoppers.” Bloodworth also told Poolson, after the billy club incident, that she threatened the victim that if he ever came home late from work she was going to get him- again. Poolson testified that she personally observed and heard Blood-worth threaten the victim that if he did not do what she ordered him to do, she would get him. Bloodworth called the victim her slave, and told him several times that he was going to clean the house, wash the clothes, do the dishes, etc. Poolson admitted on cross examination that she had previously sought mental health treatment, was then under the care of a psychiatrist, and took medication every day. She denied telling a police detective that Penny Weaver, not Bloodworth, told her these things about defendant and the victim. Poolson said she made two calls to Crime Stoppers, in August and October 1998. She admitted that she did not like Blood-worth, and did not want her sister with her. Poolson stated on redirect examination that she suffered from depression, and *123 had four nervous breakdowns due to the death of one of her sisters in 1974. She said her problems did not cause her to hallucinate, to see things that were not there, or to lie. She said | Sshe would not lie to protect her mother or her sister, and indicated that her relationship with Penny Weaver had not been that good. Poolson said on redirect examination that she was not on any medication the day Bloodworth told her about the billy club incident.
Detective Michael Carambat testified that he went to the 433 S. Lopez Street residence on 22 May 1999, in response to a complaint that a Jacqueline Bloodworth had committed a murder there. He was met by Penny Weaver upon his arrival. Some children were playing in the front room. He informed Weaver that he had received a complaint that Jacqueline Bloodworth had committed a murder there. Bloodworth was present. They invited Det. Carambat to look through the house. He said there had been some remodeling work being done in the kitchen, and there were some boxes of trash piled up there. He said the residence otherwise was neat, and there was no indication that a murder had been committed there. No one appeared to be in distress. He radioed to find out who had called in the complaint, and was informed that it had been a resident of the 2500 block of Bien-ville. He went to that location to find Jacqueline Self, Penny Weaver’s mother, in a state of high anxiety, along with some of her family members and a mental health counselor. He went outside to talk with the mental health counselor, and Penny Weaver and the children walked up. She was in an anxious state, and had tears in her eyes. They went back to the S. Lopez Street residence, and were admitted by Bloodworth, who was then detained by a uniformed officer. Det. Carambat subsequently discovered the victim’s body in a blue plastic box underneath other boxes of trash. He had seen the blue box earlier, but said he did not think it was large enough to hold a body, and he did not have any indication that a murder had been committed. He opened the box to see a lflhuman shoulder and elbow inside. There was cement inside that was not completely dry. He advised Bloodworth she was under arrest for murder, and advised her of her rights. She said she understood her rights, and told the detective that the victim had been trying to win Penny Weaver away from her, and that the victim had chastised one of the children. She believed that was improper, that it was her place to do that, and asked the victim to enter the kitchen to discuss it. When the victim entered the kitchen, she hit him with a hammer, knocked him to the floor, and continued to beat him. She said she could not stop. He said Bloodworth was talking so fast that it was hard for him to follow her. He testified on cross examination that Bloodworth had not asked for an attorney. He said as soon as she knew he had found the body she was ready to talk. Det. Carambat also admitted that it was his impression that the victim had not simply chastised a child, but had put his hands on the child.
Vanessa Davillier testified that she was a civilian employee of the New Orleans Police Department who handled Crime Stoppers hotline calls. She identified a document she prepared on 25 May 1999, three days after the murder was discovered, noting two prior calls about Penny Weaver and Jacqueline Bloodworth beating Frank Weaver. The first call was on 14 August 1998, the second on 19 October 1998. She could not divulge the name of the caller, but said it was the same person each time.
Debra Coward, another of Penny Weaver’s sisters, testified that she went to her mother’s residence in May 1999 after re *124 ceiving a telephone call from her. Coward called 911 from her mother’s residence, and police responded.
Jacqueline Self, Penny Weaver’s mother, testified that Penny Weaver had only left the victim approximately one and one-half years prior to the murder, and |inhe later moved into the S. Lopez Street residence. She said the victim was a very good father, and loved his children very much. She saw Bloodworth, her daughter and the victim while the three were living together. She would go out with her daughter and Bloodworth, while the victim stayed home with the children. She said Bloodworth treated the victim “like a dog.” She said that every time Bloodworth passed the victim she would either hit him in the head or kick him. Bloodworth told the victim numerous times that she was .going to kill him. Bloodworth and Penny Weaver bragged about one occasion when Blood-worth handcuffed the victim and beat him with a billy club, lacerating his scalp. She said Bloodworth wanted Penny and Frank’s children to call her “father” and to call Frank “Frank.”
Penny Weaver telephoned her on the night of 21 May 1999, and subsequently took her to the S. Lopez Street residence. She walked through the children’s bedroom, where they were playing. They kissed her and told her they were glad she came over. The door to the kitchen was locked, and Penny Weaver knocked on it. Bloodworth opened the door, and Self saw Frank Weaver sitting on the floor, propped up against the dryer. His face was covered with blood. She asked what was going on, and Bloodworth said, “I’m going to kill that M-F.” Self said she suggested to the victim that he leave the residence. The victim did not move. Bloodworth got out of her chair, walked over to the victim, and kicked him in the face. She then held onto the dryer, and started jumping up and down on the victim’s private parts. Then she jumped on his stomach, and then his chest. After stomping the victim, Bloodworth again said she was going to kill him. Self said she started screaming, and Bloodworth told her that if she did not stop she was going to kill her too. Bloodworth then got a hammer and hit the victim twice in the Inforehead with it. Bloodworth went into another room and returned with a bag, which she put over the victim’s head. Bloodworth twisted it, and kept twisting it. Bloodworth obtained a white cord that looked like an electrical cord, which she wrapped around the bag and pulled tight. Bloodworth then got a broomstick and shoved it into the victim’s rectum. The victim fell over, and Self screamed that he was not breathing. Bloodworth said, “Good. Let the M-F die.” She then said, “I’ll play insanity, I can get out of it.” Self identified the bag Bloodworth placed over the victim’s head, the white cord, and a piece of the broomstick Bloodworth used to sodomize the victim. Self said Blood-worth told her that the only way she would allow her to leave was if she set up an alibi for her. Bloodworth directed Self to telephone her daughter Cynthia Poolson, and tell her that the victim stole $600 and left town. Self made that telephone call, and Bloodworth allowed her to leave. A tape of the call was played for the jury. Blood-worth told Self that if she called the police or anyone else she would kill her.
Self said that when she returned home she told her husband the lie, but was shaking so badly he knew something was wrong. She lay down on her bed, but could not stop thinking about the victim. She returned to the living room and told her husband the truth. Self said she telephoned another of her daughters, Debra Coward, early the next morning and told her that she wanted to turn herself in because she had witnessed a murder. *125 Coward came to her home and called police for her. Self also called a mental health counselor from whom she had been receiving counseling in connection with the 1994 death of one of her daughters.
Self admitted on cross examination that her daughter did not make any effort to stop Bloodworth. She knew that Frank Weaver worked with Bloodworth. When asked if she knew the victim had abused the children before that night, Self | ¶ ^admitted that it had happened once. She said she had seen bruises on the back of Penny and Frank’s oldest child, and Penny informed her that Frank had done that. Furthermore, she admitted that Frank Weaver told her on the night of the murder, as he sat on the floor in the kitchen bleeding, that he had shaken his six-year old daughter because she kept screaming. She said that Bloodworth told Frank Weaver, in her presence, to tell her what had happened, i.e., what he had done. Self also stated that when she told Frank Weaver he should just leave, he said he could not move. Self saw the child that night playing in her bedroom, and said she did not appear to be injured in any way. Self said that she had seen one “little” bruise on her other granddaughter’s back on one occasion, and that it looked like it had been made by a belt. She did not know what caused the bruise, only that Penny Weaver said that Frank Weaver had done it. Self admitted on re-cross examination that she knew Frank Weaver had a drinking problem, but on redirect examination denied that he was an alcoholic.
Leroy White, a case manager for “Better Life Mental Health,” testified that on 22 May 1999 he received a call from his supervisor, and as a result went to Selfs residence. Police were already there when he arrived, and Self was extremely nervous and distraught. He remained there with Self, and later drove her to the First District Police Station. He waited while she gave a statement, and then drove her back home.
Det. Peter Bowen testified that he was the lead detective in the investigation. His report reflected that Cynthia Poolson related to him that she knew of several occasions when Bloodworth had beaten the victim. Penny Weaver had informed her that once when Frank Weaver had lost his job Bloodworth handcuffed him and beat him severely with a billy club.
| ^Bloodworth testified that she was twenty-three years old. She identified a photograph of the entrance to the kitchen, and said there was no door leading to the kitchen. She had been living with Penny Weaver for seven or eight months and their relationship was approximately eleven months old, when Frank Weaver moved in with them. She had a son approximately two years old, fathered by a man she was involved with for three weeks. She met Penny Weaver shortly after that. She said she, Penny, Penny’s two children, and her son lived together as a family. She worked as a security guard. Penny did not work. She helped Frank Weaver get a job with her security company. Frank moved in with them because he did not have anywhere else to live. She admitted feeling uncomfortable about her lover’s ex-husband coming to live with them. Blood-worth said that she related her problems with men to having been molested between the ages of five and ten by her mother’s boyfriends and babysitters. She said she wrote in her diary or journal when she got angry at Frank Weaver. The diary contained writings about her childhood, her mother’s promiscuity, and her being molested. She referred in the diary to Penny Weaver as her wife and to Frank Weaver as a “f...ing faggot” who kept trying to “f...” with her. She said in her diary that *126 she told Frank not to talk to Penny, but that he continued to do so. She referred to no one being able to see that she was going to “snap” soon. On 16 May 1999 she wrote that she wanted to die, that she could not survive anywhere else, and finally, “so kill me and get it over with.” She also stated, “I’ve completely lost my mind.” Bloodworth said Frank Weaver would hit her, she would hit him, and they would fight for a while. She admitted that there was a fight when Frank lost his job. She denied ever bragging that she beat up Frank.
114She and Penny went out on the night of 20 May 1999. By the time they returned the next day the children had gone to school. Later that day the two girls told Bloodworth that their father had sent them to bed early, and one of them did not want to go. Their father grabbed that girl and took her into the next room. Blood-worth confronted Frank Weaver and asked him why he had put his hands on “her” child. He said he had not done that. When Penny returned home she also questioned the victim. Bloodworth said she had only hit the victim once at that time. She sent Penny to get her mother, Self, so she could talk to the victim. Penny and Self returned, and Self started questioning the victim. He eventually said he had touched the child, and said so “f...ing what.” Bloodworth said that moment was when she snapped. She confirmed that she1 had heard details of what happened that night, and she said she did not deny any of it. She went on to say, “I’m extremely sorry for it, though, because it shouldn’t have happened.” She said that over the period of time the victim had been living with them he became a friend to her. When she and Penny woke up the morning after the killing, they were trying to decide what to do, and Penny said that she wished they had a larger box. Bloodworth told her to go buy one. Bloodworth said she gave the statement to police of her own free will,- and had not attempted to hide anything from them.
On cross examination, when asked if she had started beating the victim at 7:00 p.m. as she said in her statement to police, Bloodworth said it was either 7:00 or 8:00 p.m. She confirmed that it was 9:00 or 10:00 p.m. by the time she forced Self to call her daughter and tell her that Frank Weaver had stolen $600 and left. She was asked whether she looked at the victim’s body while she was “beating it for about two hours,” and she replied, “I would guess so.” She admitted that she and Penny planned a fishing trip to throw the body in the river, although she said it |1Rwas Penny Weaver’s idea to dump the body in the river. Bloodworth denied hitting the victim every time he passed her, handcuffing the victim and beating him with a billy club, making him do all of the work and calling him a slave. She admitted writing in her diary that as long as Frank kept his mouth shut he would not have any problem, but that if he said one word to defendant, her “wife or my kids, and that bitch will feel and see more f.. .ing drama than he thought existed, honest promise.” Bloodworth said she wrote in her diary because she was angry, but that it did not mean she was going to carry through with her threats. The prosecutor noted that less than two weeks later she did so, and defendant said, “Unfortunately, yes.” Bloodworth said all she remembered about the beating was the beginning, punching the victim a couple of times, slapping him, and kicking him. She did not remember the rest. She said that the old bruises noted by the coroner were the result of a fight between her and the victim. He hit her, she hit him. Blood-worth was asked whether she shed any tears when she was jumping up and down breaking the victim’s ribs and crushing his *127 scrotum, and she replied that she did not know, but that now it caused her a great deal of pain. Bloodworth denied being jealous of the victim’s relationship with Penny. Bloodworth was tearful during much of her testimony, and at one point was asked by the prosecutor who she was crying for. She replied, “Me.”
Dr. Sarah Deland, qualified by stipulation as an expert in the field of forensic psychiatry, testified that she had interviewed Bloodworth earlier in the week. Bloodworth related prior molestation in her background. Dr. Deland stated that, for someone with a history of molestation, hearing of child abuse could trigger an episode of great anger and rage. Dr. De-land was asked on cross examination whether such information would trigger the type of behavior exhibited 11fiby Blood-worth for two hours, and she replied, “Not in the average person walking down the street.” However, she again reiterated that Bloodworth had a history. In response to a question from the prosecutor, Dr. Deland stated that in her opinion Bloodworth had a mental disease or defect. She said she did not think a reasonable person would react the way Bloodworth had.

ERRORS PATENT

A review of the record reveals no errors patent.

ASSIGNMENT OF ERROR

In Bloodworth’s sole assignment of error, she argues that the evidence was insufficient to support her conviction for second degree murder.
This court set out the well-settled standard for reviewing convictions for sufficiency of the evidence in State v. Ragas, 98-0011 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 660 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La. *128 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
98-0011 at pp. 13-14, 744 So.2d at 106-107, quoting State v. Egana, 97-0318, pp. 5-6 (La.App. 4 Cir. 12/3/97), 703 So.2d 223, 227-228.
Bloodworth was convicted of second degree murder, a violation of LSA-R.S. 14:30.1, which is defined in pertinent part as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm.
Bloodworth argues that the evidence supports only a conviction for manslaughter. Manslaughter is defined in pertinent part by LSA-R.S. 14:31 as:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed; ...
The Louisiana Supreme Court has explained the relationship between the two separate offenses of homicide and manslaughter as follows:
It is the presence of “sudden passion” and “heat of blood” that distinguishes manslaughter from murder. This court has repeatedly stated, however, that “sudden passion” and “heat of blood” are not elements of the offense of manslaughter. Rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed in the absence of these factors. State v. Lombard, 486 So.2d 106 (La. 1986); State v. Tompkins, 403 So.2d 644 (La.1981). Because they are mitigatory factors, a defendant who establishes by a preponderance of the evidence that he acted in “sudden passion” or “heat of blood” is entitled to a verdict of manslaughter. Lombard, 486 So.2d at 111.
State v. Snyder, 98-1078, p. 4 (La.4/14/99), 750 So.2d 832, 837-838.
|1s“Heat of blood” or “sudden passion” is defined in the case law as provocation sufficient to deprive an average person of his self-control and cool reflection. State v. Miller, 98-642, p. 10 (La.App. 3 Cir. 10/28/98), 720 So.2d 829, 834. However, such provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled or that an average person’s blood would have cooled at the time the offense was committed. State v. Collor, 99-0175, p. 10 (La.App. 4 Cir. 4/26/00), 762 So.2d 96, 102. When reviewing the contention, as made by Bloodworth, that evidence was produced that the offender committed the crime in sudden passion or heat of blood, the Jackson v. Virginia standard of review must be employed to determine whether a rational trier of fact, viewing the evidence in a light most favorable to the prosecution, could have found that the mitigating factors were not established by a preponderance of the evidence. Snyder, 98-1078 at pp. 4-5, 750 So.2d at 838. However, defendant need not affirmatively establish the factors; the jury is free to infer the mitigating circumstances from the evidence. State v. Lindsey, 98-1064, p. 5 (La.App. 4 Cir. 6/3/98), 715 So.2d 544, 547.
Bloodworth argues in her brief that she “snapped” after Frank Weaver admitted that he had physically disciplined his daughter. Bloodworth testified at trial that she was interrogating the victim when Penny Weaver came home. Penny also *129 questioned the victim and, at the direction of Bloodworth, went to get her mother, Jacqueline Self. Bloodworth claimed that it was only upon the return of Penny Weaver, accompanied by Self, that the victim admitted physically disciplining his daughter. She also claimed she only struck the victim once prior to beating him in the presence of Penny Weaver and Self, after he confessed his transgression. However, Jacqueline Self said that when she came to the residence |igthe victim was on the kitchen floor, leaning against the dryer, with his face covered in blood. When she suggested that he leave, he said he could not move, indicating that he had already been badly injured. Furthermore, defense counsel elicited from Self on cross examination that when she came into the kitchen Bloodworth ordered the victim to tell Self what he had done, meaning what he had done to his daughter. Thus, the evidence furnishes a basis from which to conclude that Bloodworth learned what the victim had done to his daughter before Self arrived, and, also, that she had severely beaten the victim by that time. The evidence establishes that what might be characterized as the fatal phase of the beating did not begin until Self and Penny Weaver were in the room. Bloodworth admitted that this phase of the beating lasted perhaps two hours, during which time she kicked the victim in the face and stomped his genitals and chest, breaking eleven ribs. She obtained a hammer and hit him in the head several times. She retrieved a bag, placed it around his head, and twisted it, tighter and tighter, attempting to strangle him. When that did not do the job, Bloodworth obtained a cord, wrapped it around the bag, and strangled the victim with such force that, according to Dr. McGarry, she broke the bone around his throat. Finally, Bloodworth rammed a broomstick into the victim’s rectum.
There was evidence of Bloodworth’s incredible animosity toward the victim. Bloodworth began writing in her journal to vent her hatred of the victim on 6 May 1999, over two weeks before the murder. She stopped on 15 May 1999. Cynthia Poolson, one of Penny Weaver’s sisters, telephoned two tips to Crime Stoppers, seven and nine months before the killing, about beatings Bloodworth and Penny Weaver had allegedly inflicted on the victim. Dr. McGarry found evidence of injuries that had been inflicted on the victim days before he was murdered, [¡^although Bloodworth claimed those simply resulted from a fight between her and the victim. Self claimed that Bloodworth threatened to kill the victim on numerous occasions. The evidence paints a portrait of Blood-worth as someone who was pathologically jealous of the victim’s relationship with his ex-wife and his children. Bloodworth referred to the victim’s ex-wife as her own wife. She believed that she filled the traditional role of a husband and father in the household. The victim’s children called defendant “father.” The evidence establishes that Bloodworth felt that the victim intruded upon both her relationship with the victim’s ex-wife and what Bloodworth viewed as her parental relationship with the victim’s children. That Bloodworth stomped the victim’s genitals and rammed a broomstick into his rectum speaks for itself about the extent and nature of her hatred of the victim.
Dr. Deland testified that she believed Bloodworth suffered from a mental disease . or defect. Dr. Deland said that it was her opinion that for someone with a history of molestation, hearing of child abuse could trigger an episode of great anger and rage. However, Dr. Deland did not say it was her opinion that this triggered Blood-worth’s brutal killing of Frank Weaver
Viewing all of the record evidence in a light most favorable to the prosecution, any rational trier of fact could have found *130 beyond a reasonable doubt that Blood-worth had the specific intent to kill or inflict great bodily harm on the victim. Any such rational trier of fact could have further found that: (1) Bloodworth failed to prove by a preponderance of the evidence that she committed the crime in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person in her circumstances of her self-control and cool reflection; or (2) that even if Bloodworth had been sufficiently provoked to \n sudden passion or heat of blood at some point, that either her blood had actually cooled prior to the victim being killed, or that the blood of an average person in her circumstances would have cooled prior to the victim being killed.
There is no merit to this assignment of error.

CONCLUSION

For the foregoing reasons, Bloodworth’s conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.

. Bloodworth was jointly indicted with Penny Weaver. The trial court subsequently severed the defendants' prosecutions. Weaver pled guilty to conspiracy to commit manslaughter on 31 March 2000, and was sentenced to seven years at hard labor.